IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| ESP PETROCHEMICALS, INC., | § § | CASE NO. 16-60020-H2-11 |
| ESP RESOURCES, INC., | § § | CASE NO. 16-60021-H2-11 |
| DEBTORS. | § § | Joint Administration Requested |

EMERGENCY MOTION (I) FOR INTERIM AUTHORITY TO
USE CASH COLLATERAL (II) TO INCUR POST PETITION
INDEBTEDNESS UNDER 11 U.S.C. §363, §364, §502(b) AND §105 AND
(III) REQUEST FOR PRELIMINARY AND FINAL HEARINGS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AN EMERGENCY HEARING ON THIS MOTION IS SCHEDULED FOR MONDAY, MARCH 14, 2016 AT 10:30 AM IN COURTROOM 400, 515 RUSK, HOUSTON, TX 77002.

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

\*\* EMERGENCY RELIEF HAS BEEN GRANTED.  YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE OR APPEAR AT THE SCHEDULED HEARING.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

ESP Petrochemicals, Inc. and ESP Resources, Inc. (collectively "ESP" or "Debtors"), debtors and debtors in possession, file this *Emergency Motion (I) for Order Granting Interim*

*Authority to Use Cash Collateral (II) to Incur Post Petition Indebtedness Under 11 U.S.C. §363, §364, §503(b)and §105 and (III) for Preliminary and Final Hearings* (the "Motion") and in support thereof, respectfully states as follows:

### I. Summary and Emergency Basis

1. These Chapter 11 cases were each filed on March 7, 2016. By this Motion, Debtors seek authority to use Cash Collateral in order to fund operations while they formulate a Chapter 11 plan. The Debtors hereby seek authorization to use cash collateral on an interim basis. Without such relief, the Debtors will suffer immediate and irreparable harm because the Debtors would be required to cease operations immediately, and the Debtors' ability to reorganize its business would be eliminated. Upon approval of this Motion, Transfac Capital, Inc., which holds first liens on Debtors' assets, will be given replacement liens on the Debtors' post petition receivables for use of its cash collateral. A proposed budget is attached hereto as Exhibit "A" and incorporated for all purposes.

2. Additionally, prior to the Petition Date, Debtors factored substantially all of their accounts receivable with Transfac Capital, Inc. The Debtors seek to continue factoring on a post petition basis as the collection time for most accounts is generally 30-45 days and the Debtors have insufficient cash flow to operate without access to factoring. ESP is unable to obtain unsecured credit or secured credit of this type without the grant of a superpriority lien and security interest. Accordingly, the Debtors seek authority to enter into a new, secured post petition DIP Financing Agreement with Transfac and requests that the Court pursuant to 11 U.S.C. §364(d) authorize a superpriority lien and security interest to Transfac post-petition accounts receivable from and after the Petition Date.

3. The obligations owing under the Factoring Agreement and those contemplated by the DIP Financing Agreement shall constitute a super-priority administrative claim pursuant to Section 364 (c)(1) of the Bankruptcy Code and Section 503 (b)(1) of the Bankruptcy Code, and shall have priority over all other administrative expenses under Section 503(b)(1) and 507(b) of the Bankruptcy Code.

4. Debtors have moved this Court on an emergency basis for (i) authorization to use cash collateral; (ii) authorization to continue to factor accounts receivable with Transfac Capital, Inc., and (iii) a preliminary hearing regarding these matters in order to satisfy the ordinary and necessary expenses of operation. An emergency preliminary hearing is necessary since some of these expenses need to be paid before expiration of the fourteen (14) day notice period provided for in Bankruptcy Rule 4001 and for use of cash collateral. Debtors also request that the Court set a final hearing so that final cash collateral order may be approved.

## II.   Jurisdiction and Venue

5. This Court has jurisdiction over these cases pursuant to 28 U.S.C. § § 157, 1334.

6. This is a core proceeding under 28 U.S.C. § 157(b)(2)(D).

7. Venue of the Debtors' Chapter 11 cases is proper in this district pursuant to 28 U.S.C. §§ 1409.

## III.   Background Information

### A.  Overview of the Debtors

8. The above captioned Chapter 11 bankruptcy cases were each was filed on March 10, 2016 ("Petition Date") under Chapter 11 of Title 11 of the Bankruptcy Code, 11 U.S.C. §§101 et sq. (the "Bankruptcy Code"). The Debtors continue to manage their respective property as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

9. No trustee or examiner has been appointed in the Debtors' bankruptcy cases. An official committee of unsecured creditors has not yet been established.

10. A detailed factual background of the Debtors' business and operations, as well as the commencement of these Chapter 11 cases, is more fully set forth in the *Declaration of David Dugas in Support of the Debtors' Chapter 11 Petitions and Requests for First-Day Relief* filed contemporaneously herewith and incorporated herein by reference. A brief summary of the factual background is listed below.

11. ESPI is a publically traded holding company, with no independent operations apart from its subsidiaries. ESPP is a wholly owned subsidiary of ESPI that manufactures, distributes, markets and supplies specialty chemicals for a variety of oil and gas field applications including killing bacteria, separating suspended water and other contaminants from crude oil, separating the oil from the gas, pumping enhancement, pumping cleaning, as well as a variety of fluids and additives used in the drilling and production process. Customers of ESPP are typically oil and gas exploration customers who drill and operate wells.

12. Since 2014, ESP has been negatively impacted by the decline in oil prices affecting the entire oil industry. The rapid and unexpected decline in oil prices led to a significant decline in fracking activity by ESP's customers. Five major customers account for over 60% of ESPP's revenue. As a result of the of the sustained drop in oil prices, three of these customers discontinued fracking activity in the Eagle Ford and North Texas shale regions, causing ESP's revenue to drop by more than 36% in 2015. Company sales through September 2015 were $5,600,198, compared to $8,814,225 for the same period in 2014. This decrease in sales and liquidity caused the companies to default in obligations and the subsequent bankruptcy filings.

### B. Financing History

#### a. Factoring Agreement with Transfac

13.     On August 15, 2014, the ESPP entered into a Purchase and Sale Agreement (the "Factoring Agreement") with Transfac Capital, Inc. ("Transfac"), which served to replace the company's prior factoring agreement with Crestmark Commercial Capital Lending, LLC. The Factoring Agreement was amended October 1, 2014 and provides for an initial term of two years ("Contract Term"), with automatically renewing successive Contract Terms. A copy of the Factoring Agreement is attached hereto as Exhibit "B".

14.     Under the terms of the Factoring Agreement, Transfac may purchase any accounts submitted by ESPP for a servicing fee equal to the greater of 0.75% or $10, subject to others fees and charges, and a reserve account as set forth in greater detail in the Factoring Agreement.

15.     The Factoring Agreement is secured by a first lien on substantially all of the Company's assets and personally guaranteed by Mr. Dugas and Mr. Primeaux and guaranteed by ESP Resources, Inc. and another non-operating subsidiary. The total borrowing under the Factoring Agreement as of the Petition Date is approximately $605,901.

#### b. Other Financing

16.     In November 2012, the Debtors entered received proceeds of $1,000,000 from the sale of 16% Convertible Subordinated Debentures, payable at 16% interest, to Hillair Capital Investments, L.P. and Next View Capital, LP (the "Debentures"). The Debentures are secured by liens on the assets of ESPI and its subsidiaries, including assets of ESPP. These liens are subordinate to Transfac. As of the Petition Date, the collective outstanding principal balance of the Debentures is approximately $877,000.

17. In October 2013, ESPP entered into a Promissory Note and Security Agreement with ARC Products, Inc. in the principal sum of $1,194,979, payable at 5% interest over a sixty (60) month period, converting outstanding trade debt to a note. This note is subordinated to any new debt incurred by the Debtors, excluding a trade vendor debt. As of the Petition Date, the unpaid principal balance on this obligation was approximately $1,069,071.

C.   **Reasons for Filing Bankruptcy**

18. The Company been negatively impacted by the decline in oil prices affecting the oil industry as a whole. ESPP has four major customers that together account for 65% of accounts receivable (as September 30, 2015) and five major customers that together account for 61% of the total revenues earned for this same period. As of September 30, 2015, Company 2015 sales were $5,600,198, compared to $8,814,225 for the same period in 2014, a 36% decline in sales. The decrease was primarily a result of decreased sales volume from three major customers in the Eagle Ford and North Texas shale region that discontinued fracking activity. Modified EBITDA as of September 30, 2015 was $(246,236) compared to $790,698 for the same period in 2014.

19. As of September 30, 2015, total Company assets were $4,083,355, including property and equipment of approximately $1.375 million, cash of $105,882, and current assets of $2,657,103. Further, as of September 30, 2015, total liabilities were $9,554,714, including approximately $1 million in payroll taxes; secured debt to Transfac of approximately $958,000; approximately $1.1 million in Convertible Subordinated Debentures owed to Hillair Capital Investments L.P. and Next View Capital, LP; $30,000 in Convertible Subordinated Debentures to Meredino; other notes payable of approximately $1.6 million, trade payables of approximately $2.84 million, and capital and other leases of approximately $117,000.

20. The Debtors intends to utilize these Chapter 11 proceedings to streamline affairs and restructure debt in order to operate in a leaner, more efficient manner.

21. However, the Debtors' current cash situation is desperate. Without the ability to factor receivables and obtain an immediate infusion of cash, Debtors will be unable to meet current operating expenses.

## BASIS FOR REQUESTED RELIEF

### A. Cash Collateral and Authority to Use

22. The Debtors need to use the cash collateral which secures the obligations owed to Transfac in order to operate. As stated above, prior to the Petition Date, Debtors entered into the Factoring Agreement with Transfac, whereby the Debtors granted Transfac first liens and a security interest in substantially all of its assets, including accounts receivable (collectively "Collateral").

23. The total borrowing under the Factoring Agreement at September 30, 2015 was $836,226, with $121,792 held in restricted cash. While the terms of an agreed order have not been finalized, the Debtor expects that it will include, among others, the following:

> a. The Debtors may use cash collateral pursuant to an approved budget attached, with a 10% variance per line item and the ability to apply any un-used budgeted funds at its discretion.
>
> b. Transfac's prepetition liens will be adequately protected by replacement liens to the same extent and priority as their respective prepetition liens.

24. The only viable source of funding for post-petition operations is cash collateral made available to the Debtors.

25. The importance in cases like these of access to cash was recognized in *In re George Ruggieri Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir. 1984). The court in that case noted:

"A debtor, attempting to reorganize in business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild." *Id*. at 1019. The Debtors are hopeful that the secured creditor will consent to the proposed use of cash collateral, subject to receiving replacement liens and perhaps other protections as provided in an agreed order. To the extent it does not consent, however, the Court may authorize the use of cash collateral by the Debtors provided that the Court determines that any objecting entity's interest is adequately protected. 11 U.S.C. § 363(c)(2)(B) and (e).

26. Section 361 sets forth three non-exclusive examples of what may constitute adequate protection. They include providing the secured creditor with additional or replacement liens and other relief that provides the secured creditor with the "indubitable equivalent" of the secured creditor's interest in the cash collateral. Legislative history indicates that Congress intended to provide courts with flexibility to grant relief on a case-by-case basis.

27. Pursuant to the Motion, the Debtors propose to grant the secured creditor replacement liens on post-petition accounts receivable, a recognized method for providing adequate protection as specified under sections 361 and 363.

28. Without access to cash collateral, operations will cease. The going concern of the Debtors' assets will plummet, receivable collections will dry up and the insiders will quit. From that standpoint, the overall collateral position of secured creditors will deteriorate markedly, more than offsetting any erosion of the cash collateral.

29. In exchange for the use of cash Collateral, as adequate protection for the use of the cash Collateral, but only to the extent of the actual diminution in value of the pre-petition Collateral, the Debtors propose to grant to Transfac replacement liens on post-petition collateral

to the same extent and priority as heretofore existing to secure any diminution in value of the pre-petition collateral resulting from the use of cash collateral.

30. Additionally, the Factoring Agreement shall have priority over all other administrative expenses under Section 503(b)(1) and 507(b) of the Bankruptcy Code.

31. Bankruptcy Rule 4001(b)(2) states that 14 days' notice must be given before final approval of such cash collateral use is given. With this Motion, the Debtors are also seeking an emergency hearing upon expiration of the 14 day notice period.

### B. Factoring Agreement and Request to Continue

32. This Motion seeks relief under section 364(c) and (d) of the Bankruptcy Code. Section 364 reads, in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt
>   (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>   (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>   (3) secured by a junior lien on property of the estate that is subject to a lien.
>
> (d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>     (A) the trustee is unable to obtain such credit otherwise; and
>     (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>    (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

*11 U.S.C. §364(c)-(d).*

33. As stated above, prior to the Petition Date, ESPP entered into a Factoring Agreement whereby certain accounts receivable were factored with Transfac.

34. Transfac is willing to continue factoring accounts receivable for the Debtors during the pendency of these cases pursuant to a secured DIP Purchase and Sale Agreement ("DIP

Financing Agreement"), conditioned on allowance of superpriority lien and security interest in favor of Transfac on post-petition accounts receivable from and after the Petition Date.

35. Debtors have no other source of funding, other than factoring receivables. If the DIP Financing Agreement is not approved, Debtors will be unable to continue operations and manage their business.

36. The DIP Financing Agreement will be used to fund the Debtors' operations during this case through confirmation of a plan.

37. The material terms of the DIP Financing Agreement are:

- Advance Rate is 85% of invoice amount;
- Servicing Fee of the greater of .75% of face invoice amount or $10;
- DIP Facility Fee .50% of total advanced funds;
- Contract term is earlier of (i) a period of one (1) year commencing on the date of the initial Advance of Accounts and thereafter successive periods of one (1) year commencing upon completion of each prior Contract Term or (ii) the "Effective Date" (as defined in) of a confirmed Chapter 11 plan filed by the Debtors; and
- Nondefault daily interest on outstanding advance accrues at 4%/360.

38. A copy of the DIP Financing Agreement is attached as Exhibit "B." In connection with the DIP Financing Agreement, Transfac shall be granted pursuant to sections 364 (c)(1), 364(c)(2), and (c)(3) and (d)(1) of the Bankruptcy Code valid, enforceable, and perfected security interests in and liens of the highest available priority on all assets tangible, intangible, real, personal and mixed, including, without limitation, the Collateral described in the DIP Financing Agreement of the Debtor ESPP, whether now owned or hereafter acquired.

39. ESP is unable to obtain unsecured credit or secured credit of this type without the grant of a superpriority lien and security interest and requests that the Court pursuant to 11 U.S.C.

§364(d) authorize a superpriority lien and security interest to Transfac post-petition accounts receivable from and after the Petition Date.

40. Additionally, the obligations owing under the DIP Financing Agreement and Factoring Agreement shall constitute a super-priority administrative claim pursuant to Section 364 (c)(1) of the Bankruptcy Code and Section 503 (b)(1) of the Bankruptcy Code, and shall have priority over all other administrative expenses under Section 503(b)(1) and 507(b) of the Bankruptcy Code.

41. The Debtors believe that they have business justification for entering into the DIP Promissory Note in order to ensure that future operations are funded, payroll obligations are met, and to the extent necessary, and expenses of the Chapter 11 proceedings are covered.

42. The Debtors are unable to obtain alternative financing on reasonable terms with such short notice and have no other source of working capital.

43. There is little harm to general unsecured creditors under this agreement since Transfac already has liens on substantially all of the Debtors' assets.

44. The Debtors request that this Court enter the preliminary order attached hereto as Exhibit C; set a final hearing on this Motion with 14 day notice pursuant to Bankruptcy Rule 4001 if objections are filed, and at such hearing, authorize the Debtors to continue using its cash Collateral for the remainder of these Chapter 11 cases.

### IV. Conclusion

WHEREFORE, the Debtor respectfully request that the Bankruptcy Court:

1) Set an emergency preliminary hearing on this Motion;

2) Enter a preliminary order authorizing the use of cash collateral pursuant to the attached budget for 14 days;

3) Enter a preliminary order authorizing the Debtors to incur post-petition

indebtedness as an administrative claim on an interim basis;

4) Set a final hearing on this Motion after expiration of fourteen (14) days notice period required by Bankruptcy Rule 4001; and

5) Granting all such other and further relief as is just and proper.

DATED: March 11, 2016

Respectfully submitted,

HOOVER SLOVACEK LLP

By: ___*/s/ Melissa A. Haselden*___
    MELISSA A. HASELDEN
    State Bar No. 00794778
    5051 Westheimer, Suite 1200
    Houston, Texas 77056
    Telephone: 713.977.8686
    Facsimile:  713.977.5395

PROPOSED ATTORNEYS FOR DEBTORS and DEBTORS IN POSSESSION

**OF COUNSEL:**
Hoover Slovacek LLP
EDWARD L. ROTHBERG
State Bar No. 17313990
ANNIE CATMULL
State Bar No. 00794932
T. JOSH JUDD
State Bar No. 24036866
DEIRDRE CAREY BROWN
State Bar No. 24049116
BRENDETTA A. SCOTT
State Bar No. 24012219
5051 Westheimer, Suite 1200
Houston, Texas 77056
Telephone: 713.977.8686
Facsimile:  713.977.5395

## **CERTIFICATE OF CONFERENCE**

  I hereby certify that the counsel for the Debtors has conferred with Scott Siegal, counsel for the Transfac and an agreement has been reached on the interim use of cash collateral.

               */s/ Melissa A. Haselden*
               Melissa A. Haselden