IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ESP PETROCHEMICALS, INC., | § | CASE NO. 16-60020-H2-11 |
| | § | |
| ESP RESOURCES, INC., | § | CASE NO. 16-60021-H2-11 |
| | § | |
| DEBTORS. | § | Joint Administration Requested |

**AMENDED
DECLARATION OF DAVID DUGAS IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, David Dugas, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

**INTRODUCTION**

1. I am the CEO of ESP Resources, Inc. and ESP Petrochemicals, Inc., the Chapter 11 debtors and debtors-in-possession (collectively "ESP" or "Debtors"). I am familiar with the day-to-day operations, business, and financial affairs of the Debtors. I am also President of ESP Resources, Inc. and a director of each of the Debtors.

2. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (collectively the "Bankruptcy Cases") on March 10, 2016 (collectively the "Petition Date") and in support of: (a) each the Debtor's petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), filed in the United States Bankruptcy Court for the Southern District of Texas, and (b) the relief requested in the emergency motions and applications filed by the Debtors on the Petition Date (collectively, the "First Day Motions").

3. The First Day Motions seek relief intended to preserve the value of the Debtors and maintain continuity of operations by, among other things, (i) preserving the Debtors' relationships with their customers, vendors, suppliers, and employees; (ii) ensuring continued employee morale; (iii) maintaining the Debtors' cash management systems and other business operations without interruption; and (iv) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, these Chapter 11 Cases. This relief is critical to the Debtors' restructuring efforts.

4. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with other members of the Debtors' management, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors, and the oil and gas industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5. I became affiliated with ESP Resources, Inc. in December 2008 and have served as its President since 2009 and CEO since 2010. I have been CEO of ESP Petrochemicals, Inc. since 2008. I am employed in the Debtors' offices located in Lafayette, Louisiana and have more than 30 years of experience in the oil and gas industry.

6. I hold a Bachelor of Science degree in Petroleum Engineering from the University of Louisiana at Lafayette, graduating with highest honors, and am a member of the Society of Petroleum Engineers, a lifetime member of Phi Beta Kappa, a member of Tau Beta Pi National Engineering Society.

7. I gained petroleum engineering and senior management experience in the oil and gas industry holding positions of increasing responsibility in engineering and management responsibilities in the areas of production, drilling and reservoir exploitation along with property and acquisition evaluations, operations management and completion design with Chevron and Texas Pacific Oil and Gas. I was also an owner and operator of several service companies supplying equipment, goods and consulting services to the oil and gas industry in North and South America, West Africa, and the Far East prior to my employment with ESP Resources, Inc. in 2008.

## BACKGROUND

*A. History of the ESP Resources, Inc. and ESP Petrochemicals, Inc.*

8. ESP Resources, Inc. ("ESPI") is a Nevada corporation, formed in 2004 and publically traded since 2008, duly authorized to conduct business in the state of Texas. The company was formerly known as Pantera Petroleum, Inc. and changed its name to ESP Resources, in January 2009. The company is a diversified holding company which owns operating subsidiaries in the oil field services industry. The company's stock is currently traded on the OTC Market under the ticker symbol *ESPI*. ESPI maintains its principal offices located at 1003 South Hugh Wallis Road Suite G-1 Lafayette, Louisiana 70508, with district offices located in Rayne, Louisiana; Pharr, Texas; Victoria, Texas; and Center, Texas. The company has no independent operations apart from its subsidiaries. Financial reporting for ESPI and its subsidiaries is provided on a consolidated basis. ESPI currently has 350,000,000 authorized shares of common stock 10,000,000 shares of preferred stock, authorized at $.001 par value[1].

---

[1] In its September 30, 2015 10Q report filed with the SEC, ESPI reported 237,830,249 shares of common stock outstanding and no shares of preferred stock outstanding.

B. *History of ESP Petrochemicals, Inc.*

9.     ESP Petrochemicals, Inc. ("ESPP"), Louisiana corporation authorized to operate in Texas, is a wholly owned subsidiary of ESPI since 2007. ESPP was founded by Anthony Primeaux, its current President and a director of ESPI.  Mr. Primeaux has 32 years of professional experience in the value-added specialty chemical.  Mr. Primeaux received a degree in Business Management from the University of Louisiana at Lafayette and has furthered his education attending numerous industry sponsored courses in quality control and implementation, strategic planning and marketing, and drilling, production and workover chemistry programs.  Mr. Primeaux became an owner/operator of a specialty chemical company in the 1980's that was sold to a larger competitor after 11 years of successful operations. Mr. Primeaux has expertise in advanced interpretation and application petrochemical technologies having designed chemical programs to achieve maximum effectiveness in some of the most hostile environments in the operating world of production operations for the Oil and Gas industry.  Mr. Primeaux founded ESP Petrochemicals, Inc. in March, 2007 and currently serves as President of the organization. Mr. Primeaux merged ESP Petrochemicals with ESP Resources in June, 2008.

C. *Operations of the Debtors*

10.     ESP Resources, Inc., through its subsidiaries[2], manufactures, blends, distributes, and markets specialty chemicals and analytical services to the oil and gas industry in the United States. The company supplies specialty chemicals for various oil and gas field applications, including killing bacteria, separating suspended water and other contaminants from crude oil,

---

[2] Other subsidiaries of ESPI are ESP Ventures, Inc. of Delaware; ESP Corporation, S.A., a Panamanian corporation; and ESP Payroll Services, Inc. of Nevada. Two partially owned subsidiaries are ESP Advanced Technologies, Inc. of Delaware, and ESP Facility & Pipeline Services, Inc. of Delaware. None of these subsidiaries are currently operating.

{851254-00008 MMH 3/13/2016 01040004.DOCX 2 }     4

separating the oil from the gas, pumping enhancement, and pumping cleaning, as well as a various fluids and additives used in the drilling and production process. Its products comprise completion petrochemicals that are primarily used during the completion stage of oil or gas wells that are drilled in various shale formations. The company's products also comprise production petrochemicals, such as surfactants for treating production and injection problems; well completion and work-over chemicals that maximize productivity from new and existing wells; bactericides to kill water borne bacterial growth; scale compounds to prevent or treat scale deposits; corrosion inhibitors, which are organic compounds that form a protective film on metal surfaces to insulate the metal from its corrosive environment; antifoams for controlling foaming problems; emulsion breakers that are formulated for crude oils containing produced waters; paraffin chemicals that inhibit and/or dissolve paraffin to prevent buildup; and water clarifiers for problems associated with purifying effluent water. In addition, it provides various services for the upstream, midstream, and downstream sectors of the energy industry comprising new construction, modifications to operational support for onshore and offshore production, gathering, refining facilities, and pipelines.  Customers are typically oil and gas exploration customers who drill and operate wells.  ESP currently has approximately 34 employees, including 7 in the corporate office and 27 employees operating in the various district offices and in the field. The company has six managers, including three district managers and three managers in the corporate offices.  Staff and management include administrative, production personnel, managers and executives.

## EVENTS LEADING TO BANKRUPTCY

11. From 2008 to 2014, ESP's financial results were strong and revenues ranged from $9 million to $18 million a year.

12. Starting in the summer of 2014, oil prices began to decline precipitously. Over the next six months or so, the price of oil was cut in half, then in late 2015 and early 2016 the price of oil went below $30 a barrel, which is less than a third of the price of only 19 months prior, when it was $105 per barrel. The rapid and unexpected decline in oil prices led to a significant decline in fracking activity by ESP's customers. Five major customers account for over 60% of ESP's revenue. As a result of the sustained drop in oil prices, three of these customers discontinued fracking activity in the Eagle Ford and North Texas shale regions, causing the ESP's revenue to drop by more than 36% in 2015. Company sales through September 2015 were $5,600,198, compared to $8,814,225 for the same period in 2014. Modified EBITDA for these same periods was $(246,236) through September 2015, compared to $790,698 for the same period in 2014.

13. Diminished sales translated to a lack of liquidity for ESP and we defaulted in our obligations to creditors, including payment of more than $1 million in payroll taxes. This cash flow crisis also led to the initiation of numerous lawsuits and subsequent judgments against the company. All of these factors caused uncertainty regarding ESP's short-term financial viability. The state of the economy for the oil field service business is the primary reason that the Debtors have filed these bankruptcy cases.

14. As of September 30, 2015, total Company assets were $4,083,355, including property and equipment of approximately $1.375 million, cash of $105,882, and current assets of $2,657,103. Further, as of September 30, 2015, total liabilities were $9,554,714, including approximately $1 million in payroll taxes; secured debt to Transfac of approximately $958,000; approximately $1.1 million in Convertible Subordinated Debentures owed to Hillair Capital Investments L.P. and Next View Capital, LP; $30,000 in Convertible Subordinated Debentures to

Meredino; other notes payable of approximately $1.6 million, trade payables of approximately $2.84 million, and capital and other leases of approximately $117,000.

## FINANCING HISTORY

A. *Transfac Factoring.*

15. On August 15, 2014, ESPP entered into a Purchase and Sale Agreement (the "Factoring Agreement") with Transfac Capital, Inc. ("Transfac"), which served to replace the company's prior factoring agreement with Crestmark Commercial Capital Lending, LLC. The Factoring Agreement was amended October 1, 2014 and provides for an initial term of two years ("Contract Term"), with automatically renewing successive Contract Terms.

16. Under the terms of the Factoring Agreement, the Debtor sells and assigns to Transfac all right and title to the factored receivables ("Factored Accounts"). Essentially, Transfac will advance the Debtors a base rate of 90% of the gross invoice for the Factored Accounts that are purchased. The Factoring Agreement further provides for rebate of a portion of the 10% discount upon actual collection dates of the invoices. Transfac charges a servicing fee equal to the greater of 0.75% or $10, subject to others fees and charges, and a reserve account as set forth in greater detail in the Factoring Agreement.

17. The Factoring Agreement is secured by a first lien on substantially all of the Company's assets and personally guaranteed by me and Mr. Primeaux and guaranteed by ESP Resources, Inc. and another non-operating subsidiary. The total borrowing under the Factoring Agreement as of the Petition Date is approximately $605,901.

18. In order to continue to operate, ESP needs to continue the factoring arrangement under the Factoring Agreement. The financing facility in the Factoring Agreement will enable ESP to pay its budgeted expenses efficiently by not having to wait for the 30-45 days it usually

takes for the receivables to be paid. The access to immediate cash from its receivables is essential to ESP.

### B. Other Financing

19. In November 2012, the Debtors received proceeds of $1,000,000 from the sale of 16% Convertible Subordinated Debentures, payable at 16% interest, to Hillair Capital Investments, L.P. and Next View Capital, LP (the "Debentures"). The Debentures are secured by liens on the assets of ESPI and its subsidiaries, including assets of ESPP. These liens are subordinate to Transfac. As of the Petition Date, the collective outstanding principal balance of the Debentures is approximately $877,000.

20. In October 2013, ESPP entered into a Promissory Note and Security Agreement with ARC Products, Inc. in the principal sum of $1,194,979, payable at 5% interest over a sixty month period, converting outstanding trade debt to a note. This note is subordinated to any new debt incurred by the Debtors, excluding a trade vendor debt. As of the Petition Date, the unpaid principal balance on this obligation was approximately $1,069,071.

## FIRST-DAY MOTIONS

21. Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First-Day Motions. The Debtors anticipate that the Court will conduct a hearing within two or three businesses days after the commencement of the Bankruptcy Cases (the "First-Day Hearing"), during which the Court will entertain the argument of counsel with respect to the relief sought in the First-Day Motions.

22. Generally, the First-Day Motions have been designed to meet the immediate goals of: (a) maintaining and protecting the Debtors' assets; (b) establishing procedures for the efficient administration of the case; (c) continuing the Debtors' operations during this cases with as little

disruption and loss of productivity as possible; and (d) maintaining the confidence and support of vendors, customers, employees, and other key constituencies.

23. I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in the Chapter 11 Cases.

24. The First-Day Motions are identified and more fully described below[3].

A. *EMERGENCY MOTION OF THE DEBTORS FOR ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES*

25. As discussed above, ESPP is a wholly owned subsidiary of ESPI. The companies share common ownership and have the same management and same board of directors.

26. Joint administration of these Chapter 11 Cases: (a) is warranted because the Debtors' financial affairs and business operations are closely related, and (b) will ease the administrative burden on the Court and parties-in-interest in these Cases.

27. The Debtors anticipate that numerous notices, applications, motions, other documents, pleadings, hearings, and orders in these Cases will affect all of the Debtors. With (2) two affiliated Debtors, each with its own case docket, the failure to administer these Cases jointly would result in numerous duplicative pleadings being filed and served upon parties identified in separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Debtors, the Clerk of this Court (the "Clerk"), creditors, and other parties-in-interest in these Cases.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day Motion.

{851254-00008 MMH 3/13/2016 01040004.DOCX 2 }   9

28.     Joint administration will permit the Clerk to use a single general docket for the Debtors' cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in all of these Cases.

29.     The Debtors request that the official caption to be used by all parties in all pleadings in the jointly administered cases be in the form set forth in the motion. The Debtors submit that use of this simplified caption will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

30.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and party-in-interest will maintain claims or rights it has against the particular estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the efficiencies and reductions in costs resulting from joint administration. The Court also will be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee also will be simplified.

31.     It would be a misuse of judicial resources to conduct separate hearings on separate motions that will seek almost identical relief by two companies who share some of the same liabilities, common management and ownership.

B.  *EMERGENCY MOTION OF THE DEBTORS FOR ORDER EXTENDING TIME TO FILE SCHEDULES AND STATEMENTS*

32.     Pursuant to this motion, the Debtors seek the entry of an order extending the time within which it must file its schedules of assets and liabilities, lists, and statements of financial

affairs (collectively, the "Schedules") for approximately (14) days from the current deadline, without prejudice to the Debtors' right to request further extensions should the need arise.

33.     The Debtors submit that cause exists sufficient to extend its time to file the Schedules in view of the facts and circumstances of this case.  The Debtors request an extension, through April 7, 2016, to file their respective statements and schedules.

34.     Debtors' financial reporting is complex because it is prepared on a consolidated basis through ESP Resources, Inc., a publically traded entity.  Debtors are in the process of finalizing 2015 year-end reporting for the Debtors and related subsidiaries.   Debtors do not anticipate being able to finalize necessary reporting and collect and assemble all of the requisite financial data and other relevant information required to complete all of the Schedules and Statement of Financial Affairs prior to the current March 24 deadline.

35.     Moreover, Debtor ESP Resources, Inc. is a publicly traded company with over 1300 equity holders.  ESP must obtain current lists of these equity holders from third party providers whose business is to compile the same and ESP has no control over when these lists will be received from the third parties. Accordingly, additional time is needed to incorporate that information into ESP's schedules.  This information must be obtained before ESP Resources, Inc. can file an accurate Creditor Mailing Matrix.

36.     Although the statements and schedules are in process, the Debtors have not had an opportunity to complete the detailed information necessary in order to file accurate statements and schedules and do not anticipate being able to comply with the deadline.

37.     The original deadline for filing the schedules and statements is March 21, 2016.  Granting the requested extension will not prejudice any party in interest because the 341 Meeting of Creditors is scheduled for April 26, 2016 and will not occur prior to the requested extension.

Thus, the administration of this case will not be delayed by permitting the Debtors to have additional time to file their Schedules and Statements of Financial Affairs.

38. The Debtors' Chapter 11 petitions were each accompanied by, inter alia, (a) resolutions authorizing the filing of such petition, (b) a list containing the names and addresses of each Debtor's twenty (20) largest unsecured creditors, excluding insiders, (c) a Corporate Ownership Statement for each Debtor, and (d) a creditor matrix containing the name and address of all of each Debtor's creditors.

39. To that end, the Debtors have already begun and will continue to work diligently to compile the information necessary to complete the Schedules. Specifically, the Debtors must gather information from various documents, sources, and locations and complete the posting of their books and records as of the Petition Date or other dates, as appropriate. Then the Debtors must review that information and prepare and verify the Schedules. Given the critical matters with which the Debtors have been and is currently dealing with, the Debtors do not believe that it will have sufficient time to complete preparation of the Schedules within the fourteen (14) days required by Bankruptcy Rule 1007(c). The Debtors therefore believes that they will need approximately an additional fourteen (14) days to prepare and file each Debtor's Schedules.

40. The narratives and data incorporated into the Chapter 11 Petition and the exhibits attached thereto provide creditors and parties-in-interest with a substantial amount of information about the Debtors and their financial affairs. Additionally, upon reasonable request, the Debtors will provide parties-in-interest with material information concerning its business and financial affairs, including information that will be contained in the Schedules, as such information becomes available.

C. *EMERGENCY MOTION OF THE DEBTORS FOR ORDER (1) AUTHORIZING DEBTORS TO PAY CERTAIN PRE-PETITION EMPLOYEE WAGES, BENEFTIS, WITHHOLDING OBLIGATIONS, AND (2) DIRECTING BANKS TO HONOR RELATED PRE-PETITION TRANSFERS*

41. In order to enable the Debtors to retain current employees (the "Employees") during this critical time, minimize the personal hardship such Employees may suffer if pre-petition employee-related obligations are not paid when due, or honored as expected, and maintain morale, the Debtors, by this motion, are seeking authority, in their discretion, to pay and/or honor, as the case may be, (a) certain pre-petition claims of Employees, including, but not limited to, claims for wages, salaries, commissions, vacation, sick leave, 401(k) plan contributions, and unpaid reimbursable expenses and certain costs and disbursements related to the foregoing (collectively, the "Employee Compensation"), up to the statutory cap of $12,475 per Employee, and (b) all pre-petition federal and state withholding obligations. The Debtors further request that the Court enter an order directing all banks to honor the Debtors' pre-petition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

42. The Employees are essential to the continued operation of the Debtors' business and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their respective estates, the Debtors'

customers, the value of their assets and business, and the ability to achieve their objectives in Chapter 11.

> D. *MOTION OF THE DEBTOR FOR ORDER (1) AUTHORIZING MAINTENANCE OF BANK ACCOUNTS AND CONTINUED USE OF EXISTING BUSINESS FORMS AND CHECKS, (2) APPROVING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (3) WAIVING CERTAIN INVESTMENT AND DEPOSIT GUIDELINES, AND (4) GRANTING RELATED RELIEF*

43. The Debtors operate a consolidated cash management system which is described in the motion. As set forth therein, the system builds in efficiencies that should be preserved during the Chapter 11 Cases for the benefit of the secured parties as well as to keep costs and administration to a minimum, which will benefit all creditors.

44. By the motion, the Debtors seek an order: (a) authorizing the continued use of the Debtors' existing bank accounts and continued use of existing business forms and checks; (b) continued use of the existing cash management system; (c) waiving investment and deposit guidelines of Section 345 of the Bankruptcy Code and the United States Trustee's Guidelines; and (d) providing any additional relief required in order to effectuate the principal relief sought in the motion. The relief requested will help ensure the Debtors' smooth transition into Chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 cases. A chart listing each financial institution and bank account is included with the motion.

> E. *AMENDED MERGENCY MOTION (I) FOR INTERIM AUTHORITY TO USE CASH COLLATERAL (II) TO INCUR POST PETITION INDEBTEDNESS UNDER 11 U.S.C. §363, §364, §502(b) AND §105 AND (III) REQUEST FOR PRELIMINARY AND FINAL HEARINGS*

45. Pursuant to this motion, the Debtors are seeking authority for the use of Cash Collateral, to continue to factor accounts receivable to Transfac and to grant to the Lender adequate protection for claims arising from the diminution of value of their respective collateral from the

Debtors' use of the Cash Collateral and to grant superpriority liens for accounts factored on a post petition basis.

46. Here, it is essential to the Debtors' post-petition operations, the maintenance of the value of its businesses that it use Cash Collateral and Factor Accounts. The Cash Collateral will only be used to pay for expenses that are set forth in a budget attached to the motion. Such expenses include, but are not limited to, employee payroll and other benefits, rent on leased equipment or office space, corporate overhead, supplies, various reorganizational expenses, and other expenses related to operating the businesses.

47. The Debtors have negotiated a budget (the "Budget") with Transfac that reflects the Debtors' projected expenditures during the period from the Petition Date through March 21, 2016 (the "Budget Period"), and estimate the period in which such cash expenditures will either need to be paid or accrue. The Debtors have also negotiated post petition DIP Financing with Transfac whereby Transfac will continue to Factor Accounts of the Debtors pursuant to the DIP Purchase and Sale Agreement attached to the motion. At this time, the Debtors anticipate that cash and receipts from operations will be sufficient, if the Debtors are able to continue to Factor Accounts with Transfac, to satisfy the disbursements reflected in the Budget. After entry of a final order authorizing the use of Cash Collateral and approving DIP Financings, and the expiration of the Budget, the Debtors will submit additional, amended, and/or supplemental Budgets for periods occurring after the Budget Period.

48. The reasons supporting the Debtors' use of Cash Collateral and Factoring Accounts are compelling. As the Debtors have extremely limited funds, use of Cash Collateral and ability to Factor Accounts is required to fund the day-today operating expenses of the business, including payments to employees, purchase of supplies, as well as reorganizational expenses necessary to

maintain the value of the business. Unless this Court authorizes use of the Cash Collateral and continued ability to Factor Accounts, the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtors' business and its bankruptcy estate. Indeed, absent sufficient funds to support the business, the Debtors will have to cease operations. Therefore, authorization to use Cash Collateral and ability to Factor Accounts pending the Final Hearing is in the best interests of the Debtors' bankruptcy estates and creditors.

49. In exchange for the use of Cash Collateral, as adequate protection for the use of the Cash Collateral, but only to the extent of the actual diminution in value of the pre-petition Collateral, the Debtor proposes to grant to the Lender replacement liens in the form of security interests and liens upon the same types and kinds of assets upon which it held a prepetition lien, subject only to valid, perfected, and enforceable prepetition liens (if any) which are senior as of the Petition Date, as well as an additional lien upon the Debtor's post-petition accounts and accounts receivables. The grant of replacement liens will only apply to the extent that the pre-petition Collateral was encumbered by valid and perfected liens and security interests (collectively, the "Replacement Liens"). The Replacement Liens will not attach to any avoidance actions under Chapter 5 of the Bankruptcy Code. Additionally, the Debtors propose to grant Transfac superpriority liens and security interest post-petition accounts receivable from and after the Petition Date. In addition, under the terms of the proposed agreement with Transfac, the obligations owing under the DIP Purchase and Sale Agreement and Factoring Agreement shall constitute a super-priority administrative claim pursuant to Section 364 (c)(1) of the Bankruptcy Code and Section 503 (b)(1) of the Bankruptcy Code, and shall have priority over all other administrative expenses under Section 503(b)(1) and 507(b) of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  March 13, 2016

*David Dugas with permission by /s/ Melissa A. Haselden*

David Dugas