

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

ENTERED
03/17/2017

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11** |
| | § | |
| **ESP PETROCHEMICALS, INC.** | § | **CASE NO.  16-60020-V2-11** |
| **ESP RESOURCES, INC.** | § | **CASE NO.  16-60021-V2-11** |
| | § | |
| | § | **Jointly Administered Under** |
| **Debtors** | § | **Case No. 16-60020-V2-11** |
| | § | **Judge David R. Jones** |

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS ENCUBRANCES AND OTHER INTERESTS, (B)
APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF THE UNEXPIRED EXECUTORY
CONTRACTS AND LEASES**
(Docket No. 238)

This matter having come before the Court on the emergency motion, dated March 8, 2017 (the "Sale Motion") of the above-captioned debtors (the "Debtors"), for entry of an order under 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014 (the "Sale Order") authorizing (i) the Debtors' sale (the "Sale") of substantially all of their assets (the "Assets") on an emergency basis, free and clear of all liens, claims, interests or encumbrances of any nature whatsoever, whether legal or equitable in nature, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated and whether contractual, statutory or common law in origin, including any interest in property (collectively, the "Interests") (except those expressly assumed, pursuant to the Asset Purchase Agreement, dated as of March 8, 2017 (the "Asset Purchase Agreement"), between Debtors and Encore Chemical Solutions, LLC ("Buyer"), (ii) the Debtors' assumption and assignment to Buyer of certain executory contracts and unexpired leases, pursuant to the Asset Purchase Agreement free and clear of all Interests, and (iii) the assumption by Buyer of certain liabilities of Debtors pursuant to the Asset Purchase Agreement; and the Court having  reviewed and considered; (i) the Sale Motion, (ii) any objections thereto, and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the hearing on the Sale Motion ("Sale Hearing"); and it appearing that the relief requested in the Sale Motion is in the best interests of Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing, and after due deliberation thereon; and good cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT[1]:

A. The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §1334, and this matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (N). Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

1 Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. Fed. R. Bankr. P. 7052.

B. The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363(b), (f), (m), and (n), 365, and 1146(c) of the United States Bankruptcy Code ("Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9014.

C. (a) Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, the Sale, and the assumption and assignment to Buyer of certain executory contracts of the Debtors has been provided in accordance with 11 U.S.C. §§ 102(1), 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014, other provisions of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court, orders of the Bankruptcy Court, and other applicable law, including to all parties to the Assumed Contracts and Assumed Liabilities, and due process (b) such notice was good and sufficient, and appropriate under the particular circumstances, and (c) no other or further notice of the Sale Motion, or the Sale Hearing, or the assumption and assignment of the executory contracts is or shall be required.

D. As demonstrated by (a) the testimony and other evidence proffered or adduced at the Sale Hearing; and (b) the representations of counsel made on the record at the Sale Hearing, Debtors have adequately marketed the Assets under the circumstances.

E. Debtors (a) have full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the sale of the Assets by Debtors has been duly and validly authorized by all necessary corporate action of Debtors, (b) have all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (c) have taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by such Debtors of the transactions contemplated thereby. No consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for Debtors to consummate such transactions.

F. Approval of the Asset Purchase Agreement and consummation of the Sale at this time are in the best interests of Debtors, their creditors, their estates and other parties in interest.

G. Debtors have demonstrated both (a) good, sufficient and sound business purpose and justification; and (b) compelling circumstances for the Sale pursuant to 11 U.S.C. § 363(b) prior to a plan of reorganization in that, among other things:

     (i) Under the circumstances, Buyer is only willing to proceed to acquire the Assets if the Sale can be consummated quickly.

     (ii) Debtors diligently and in good faith marketed the Assets to secure the highest and best offer, in view of the exigent circumstances, therefor by, among other things, emailing the Notice Sale Hearing to each of the entities that had previously expressed an interest in the Debtors' Assets.

     (iii) A sale of the Assets at this time to Buyer pursuant to 11 U.S.C. § 363(b) is the only viable alternative to preserve the value of the Assets, and maximize Debtors' estates for the benefit of all constituencies. Delaying the Sale of the Assets undoubtedly will result in a loss of value of the Assets. Further, any delay of the Sale

of the Assets may result in Buyer's termination of the Asset Purchase Agreement and result in an alternative outcome that will achieve far less value for creditors.

H.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

I.     The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtors and Buyer without collusion, in good faith, and from arm's-length bargaining positions. Neither Debtors nor Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.     Buyer is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, Buyer is entitled to all of the protections afforded thereby. Buyer will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Asset Purchase Agreement and at all times after the entry of this Sale Order. Buyer has not engaged in collusive bidding or otherwise violated the provisions of § 363(n) of the Bankruptcy Code.

K.     The consideration provided by Buyer for the Assets pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) is the highest and best offer for the Assets, (c) will provide a greater recovery for Debtors' creditors and other interested parties than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

L.     The Sale must be approved and consummated promptly in order to preserve the value of the Assets.

M.     The transfer of the Assets to Buyer will be a legal, valid and effective transfer of the Assets, and will vest Buyer with all right, title and interest of the Debtors to the Assets free and clear of all Interests, including any taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the date (the "Closing Date") of the consummation of the Asset Purchase Agreement (the "Closing"), except for the Permitted Liens and the obligations arising from the Assumed Contracts and Assumed Liabilities as provided for in the Asset Purchase Agreement.

N.     Buyer would not have entered into the Asset Purchase Agreement, and would not consummate the transactions contemplated thereby, if the sale of the Assets to Buyer were not free and clear of all Interests of any kind or nature whatsoever as provided herein, and if the assignment of the executory contracts, including the Assumed Contracts and Assumed Liabilities, could not be made under section 365 of the Bankruptcy Code.

O.     Buyer shall purchase the Assets free and clear of all liens, claims, encumbrances, and equitable servitudes pursuant to 11 U.S.C. § 363 except for the obligations arising from the Assumed Contracts and Assumed Liabilities as provided for in the Asset Purchase Agreement. Buyer does not constitute a successor-in-interest to Seller.

P.     Debtors may sell the Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)–(5) has been satisfied.  Those (a) holders of Interests; and (b) non-debtor parties to executory contracts being assigned who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2). Those (a) holders of Interests and (b) non-debtor parties to executory contracts being assumed and assigned who did object are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they claim or may claim an Interest.

Q.     Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign certain executory contracts to Buyer as set forth in the Asset Purchase Agreement, and the assumption and assignment of the executory contracts is in the best interests of the Debtors, their estates, and their creditors. The executory contracts being assigned to, and the liabilities being assumed by Buyer, are an integral part of the Assets being purchased by Buyer and, accordingly, the assumption and assignment of the Assumed Contracts and Assumed Liabilities are reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination.

R.     Debtors and Buyer:  (a) have provided adequate assurance of Buyer's future performance of the executory contracts being assigned pursuant to the Asset Purchase Agreement, including the Assumed Contracts and the Assumed Liabilities, within the meaning of 11 U.S.C. § 365(b)(1)(C) and 365(f)(2)(B); (b) will cure, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the executory contracts being assigned pursuant to the Asset Purchase Agreement, including the Assumed Contracts and Assumed Liabilities, within the meaning of 11 U.S.C. § 365(b)(1)(A); and (c) will provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the executory contracts being assigned pursuant to the Asset Purchase Agreement, within the meaning of 11 U.S.C. § 365(b)(1)(B).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

The Sale Motion is granted, as further described herein.

1.     All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are overruled on the merits.

2.     The Asset Purchase Agreement, in the form attached hereto (without its voluminous exhibits and schedules) as <u>Exhibit A</u>, and all of the terms and conditions thereof, is hereby approved.

3.     Pursuant to 11 U.S.C. § 363(b), Debtors are authorized and directed to consummate the Sale, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement.

4.     Debtors are authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all

additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, and to take all further actions as may be requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer or reducing to possession, the Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

5. Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, Pursuant to Sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Purchased Assets to the Buyer on the Closing Date and such transfer shall (a) constitute a legal, valid, binding, and effective transfer of the Purchased Assets, (b) vest the Buyer with title to the Purchased Assets, and upon the Debtors' receipt of the Purchase Price, be free and clear of all Claims and Interests (other than Assumed Obligations), with such Claims and Interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets (subject to any claims and defenses the Debtors' or their estate may possess with respect thereto).

6. Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Interests of any kind or nature whatsoever against or in Debtors or the Assets, arising under or out of, in connection with, or in any way relating to, Debtors, the Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Assets to Buyer, hereby are forever barred and estopped from asserting against Buyer, its successors or assigns, its property, or the Assets, such persons' or entities' Interests.

7. Pursuant to 11 U.S.C. §§ 105 (a) and 365, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to Buyer, and Buyer's assumption on the terms set forth in the Asset Purchase Agreement of the executory contracts being assigned, including the Assumed Contracts and the Assumed Liabilities, is hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f)(2) with respect thereto are hereby deemed satisfied.

8. Debtors are hereby authorized and directed in accordance with 11 U.S.C. §§ 105(a) and 365 to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the executory contracts and unexpired leases being assigned pursuant to the Asset Purchase Agreement, including the Assumed Contracts and Assumed Liabilities, free and clear of all Interests of any kind or nature whatsoever, and (b) execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the executory contracts being assigned pursuant to the Asset Purchase Agreement to Buyer; provided, however, that this paragraph shall not defeat any right which a party to an assigned executory contract may have against Debtors or Debtors' estates under section 365 of the Bankruptcy Code.

9. The executory contracts being assigned to Buyer pursuant to the Asset Purchase Agreement, including the Assumed Contracts and the Assumed Liabilities, shall be transferred to, and remain in full force and effect for the benefit of Buyer in accordance with their respective

terms, notwithstanding any provision in any such assigned contracts that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors and their estates shall be relieved from any liability for any breach of any assigned contracts after such assignment to and assumption by Buyer on the Closing Date, first arising post-Closing.

10.     The Purchase Price provided by Buyer for the Assets under the Asset Purchase Agreement (a) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code; and (b) is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

11.     On the Closing Date of the Sale, each of Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Assets, if any, as such Interests may have been recorded or may otherwise exist.

12.     This Sale Order shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to Debtors or the Assets prior to the Closing have been unconditionally released, discharged and terminated (other than the Permitted Liens and the obligations arising from the Assumed Contracts and Assumed Liabilities), and that the conveyances described herein have been effected.

13.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens or other documents or agreements evidencing Interests in Debtors or the Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to Debtors or the Assets or otherwise which are released hereunder, then Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Assets of any kind or nature whatsoever and the filing officer is hereby directed to accept the filing of the Sale Order by Buyer as evidence of the release of such encumbrances.

14.     All entities who are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to Buyer on the Closing Date.

15.     Under no circumstances shall any holder of an Interest be able to commence, continue or otherwise pursue or enforce any remedy, claim or cause of action against Buyer, except with respect to the Permitted Liens and the obligations under the Assumed Contracts and Assumed Liabilities specifically assumed by Buyer pursuant to the Asset Purchase Agreement.

16.     Subject to, and except as otherwise provided in the Sales Procedures Order, any amounts that become payable by Debtors pursuant to the Asset Purchase Agreement or any of the documents delivered by Debtors pursuant to or in connection with the Asset Purchase Agreement shall (a) constitute administrative expenses of the Debtors' estates and (b) be paid by the Debtors in the time and manner as provided in the Asset Purchase Agreement, without further order of this Court.

17.     Within 14 days of Closing, Buyer shall pay the aggregate outstanding balance owed to Ford Motor Credit, estimated at $9,088.40 if paid by March 31, 2017, with respect to the following vehicles:

- 2011 Ford F350 with VIN ending in 8284; payoff through 3-31-17 = $3,394.54; account xxxx8086
- 2011 Ford F150 with VIN ending in 7461; payoff through 3-31-17 = $1,463.48; account xxxx4624
- 2011 Ford F150 with VIN ending in 0032; payoff through 3-31-17 = $2,095.59; account xxxx4625
- 2011 Ford F150 with VIN ending in 8291; payoff through 3-31-17 = $2,134.79; account xxxx4639.

18.     As provided in the Asset Purchase Agreement, Buyer shall be vested with the sole right to pursue all post-petition causes of actions against or involving current or former employees of the Debtors, including, but not limited to, claims related to trade secrets, breach of confidentiality, and of a similar nature, but excluding post-petition claims or causes of action against or involving employees or former employees related to (a) the unauthorized transfer or monies or (b) the unauthorized transfer of other tangible property which is unrelated to the Purchased Assets.

19.     This Court retains jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (b) interpret, implement, and enforce the provisions of this Sale Order.

20.     The transactions contemplated by the Asset Purchase Agreement are undertaken by Buyer in good faith, as that term is used in 11 U.S.C. § 363(m), and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to Buyer, unless such authorization is duly stayed pending such appeal prior to the Closing. Buyer is a purchaser in good faith of the Assets, and Buyer is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

21.     The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, Buyer, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Buyer pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Code, as to which trustee(s) such terms and provisions likewise shall be binding. Buyer has not engaged in collusive bidding or otherwise violated the provisions of § 363(m) of the Bankruptcy Code.

22.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

23.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on Debtors' estates.

24.     Notwithstanding anything to the contrary herein, Buyer shall not be relieved from any liabilities specifically assumed by Buyer as set forth in the Asset Purchase Agreement.

25.     Except as provided in the Asset Purchase Agreement, this Sale Order, or other order of this Court, after the Closing, Debtors and their estates shall have no further liabilities or obligations with respect to the Assumed Contracts and the Assumed Liabilities.

26.     Following the Closing, Buyer shall be required to comply with all applicable law, including but not limited to, local, state and federal rules, regulations, statutes, and permits pertaining to environmental regulations with respect to the Assets.

27.     As provided by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d), this Sale Order shall not be stayed for 14 days after the entry of the Sale Order and shall be effective and enforceable immediately upon entry of this Order.

28.     The provisions of this Sale Order are non-severable and mutually dependent.

29.     Within thirty (30) days after entry of this Sale Order and subsequent to the Closing and transition of Assets to Buyer, the Debtors shall file with the Court a notice of occurrence of the sale closing and transfer of assets and shall request to convert these cases Chapter 7.

30.     As provided in the Asset Purchase Agreement, after Closing and conversion of these cases to Chapter 7, Buyer shall remit to the duly appointed Chapter 7 Trustee, the sum of $25,000.

31.     To the extent not paid prior to conversion of the Bankruptcy Case to Chapter 7, Buyer shall be responsible for payment of remaining allowed unpaid professional fees for Hoover Slovacek, Debtors' counsel, Charles Johnson, Chief Restructuring Officer, and Patrick Devine, counsel for Official Committee of Unsecured Creditors in the aggregate amount of $25,000. Buyer's right to object to the allowance of any professional fees asserted is preserved.

32.     Notwithstanding any other provision of this order or the Asset Purchase Agreement, the terms of the stipulation and agreed order by and between Debtors, IMI Market Street, LLC ("IMI") and Martech Media, Inc. ("Martech") outlined in docket no. 228 shall remain binding and enforceable and the security deposits to be retained by (or paid to) IMI and Martech shall not be sold to the buyer pursuant to the terms of this Sale Order.

33.     Upon Closing, Escrow Agent may disburse payment of professional fees to the extent they have already been allowed under previous Court order or in accordance with the interim fee procedures order approved by the Court at docket number 141.

34.     Escrow Agent shall not disburse any proceeds or funds received from the Buyer without consent from Amerisource or further Court order.

**Signed:  March 17, 2017.**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**ESP PETROCHEMICALS, INC. & ESP RESOURCES, INC.**

**AS SELLER**

**AND**

**ENCORE CHEMICAL SOLUTIONS, A NEVADA LLC**

**(OR ITS NOMINEE, AFFILIATE, SUCCESSOR IN INTEREST, OR ASSIGNS),**

**AS BUYER**

Effective Date: **_____, 2017**

# TABLE OF CONTENTS

**Page**

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Headings, Interpretation, Etc | 6 |

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

| | | |
|---|---|---|
| Section 2.1 | Purchase and Sale of Assets | 6 |

## ARTICLE III
## NO ASSUMPTION OF LIABILITIES

| | | |
|---|---|---|
| Section 3.1 | Assumption and Exclusion of Liabilities | 9 |

## ARTICLE IV
## PURCHASE PRICE

| | | |
|---|---|---|
| Section 4.1 | Purchase Price | 11 |
| Section 4.2 | Earnest Money | 11 |
| Section 4.3 | Prorations | 11 |
| Section 4.4 | Allocation of the Purchase Price | 11 |

## ARTICLE V
## THE CLOSING

| | | |
|---|---|---|
| Section 5.1 | Time and Place of Closing | 12 |
| Section 5.2 | Deliveries by Seller | 12 |
| Section 5.3 | Deliveries by Buyer | 13 |

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| Section 6.1 | Authorization, No Conflicts, Etc. | 13 |
| Section 6.2 | Consents and Approvals | 14 |
| Section 6.3 | Title to Assets and Properties; Liens | 14 |
| Section 6.4 | Material Facts | 14 |
| Section 6.5 | FIRPTA Certification | 14 |

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| Section 7.1 | Due Organization, Etc. | 14 |
| Section 7.2 | Authorization, Etc. | 15 |
| Section 7.3 | Consents and Approvals | 15 |

**ARTICLE VIII**
**COVENANTS**

Section 8.1     Conduct of Business .................................................................. 15
Section 8.2     Access ...................................................................................... 16
Section 8.3     Bankruptcy Filings.................................................................... 16
Section 8.4     Commercially Reasonable Efforts .............................................. 17
Section 8.5     Filings with Governmental Entities; Permits and Licenses ........... 17
Section 8.6     Tax Matters .............................................................................. 17
Section 8.7     Amounts Received and Paid to Seller After Closing...................... 18
Section 8.8     Further Assurances.................................................................... 18
Section 8.9     Books and Records ................................................................... 18
Section 8.10    Notice of Sale........................................................................... 19

**ARTICLE IX**
**CONDITIONS**

Section 9.1     Conditions to Seller's Obligations ............................................. 19
Section 9.2     Conditions to Buyer's Obligations............................................. 20

**ARTICLE X**
**TERMINATION**

Section 10.1    Termination............................................................................... 21
Section 10.2    Procedure and Effect of Termination.......................................... 23

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1    Successors and Assigns.............................................................. 24
Section 11.2    Notices ..................................................................................... 24
Section 11.3    Expenses; Transfer Taxes .......................................................... 26
Section 11.4    Entire Agreement ...................................................................... 26
Section 11.5    "AS IS/WHERE IS" SALE ....................................................... 26
Section 11.6    Waiver...................................................................................... 26
Section 11.7    Amendment ............................................................................. 27
Section 11.8    Counterparts; Facsimile Signatures ........................................... 27
Section 11.9    Choice of Law.......................................................................... 27
Section 11.10   Jurisdiction; Consent to Service of Process ................................ 27
Section 11.11   Damage or Destruction ............................................................. 28

**Schedules**

Schedule 2.1(a) – Purchased Assets – Assumed Contracts

**Exhibits**

Exhibit A-1 – Sale of Assets /Form of Order
Exhibit B – Form of Bill of Sale
Exhibit C – Form of Assignment and Assumption Agreement
Exhibit D – Form of Escrow Agreement

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, effective as of _____, 2017, is made by and between ESP Petrochemical, Inc., a Louisiana corporation ("Debtor" and "Seller"), and Encore Chemical Solutions, LLC, a Nevada, LLC or its nominee, affiliate, successors in interest, or assigns ("Buyer").

### RECITALS

A.      Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), Under Case No. 16-60020; *In re ESP Petrochemicals, Inc, ESP Resources, Inc.* (the "Bankruptcy Case").

B.      Seller has continued in possession of its respective assets and management of its Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.      Seller has determined to sell or assign certain assets to Buyer; and Buyer desires to purchase, the assets described in this Agreement, all upon the terms and conditions of this Agreement and the Sale Order attached as Exhibit A-1.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1      Definitions. As used in this Agreement, the following terms have the following meanings:

"Accounts Lender" shall mean Amerisource Funding, Inc., a Texas corporation.

"Affiliate" of any Person means any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person; and, for the purposes of this definition only, "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management, policies or activities of a Person whether through the ownership of securities, by contract or agency or otherwise.

"Agreement" means this Asset Purchase Agreement, including the Exhibits and the Schedules attached hereto.

"Allocation" has the meaning set forth in Section 4.3(a).

"Alternative Agreement" means any agreement for an Alternative Transaction.

"Alternative Buyer" means any party (other than a Debtor) that is a party to an Alternative Transaction.

"Alternative Transaction" means an asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Bankruptcy Court) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to Buyer.

"Ancillary Agreements" means the Assignment and Assumption Agreement, the Bill of Sale, and all other instruments, certificates, and other agreements contemplated by this Agreement that are entered into by the Parties or their respective Affiliates in connection with the Transaction.

"Assignment and Assumption Agreement" means an Assignment and Assumption Agreement entered into between Seller and Buyer in the form attached hereto as Exhibit C relating to the Assumed Contracts.

"Assumed Contracts" has the meaning set forth in Section 2.1(a)(ii).

"Bankruptcy Case" has the meaning set forth in Recital A.

"Bankruptcy Code" has the meaning set forth in Recital A.

"Bankruptcy Court" has the meaning set forth in Recital A.

"Bill of Sale" means a Bill of Sale relating to the Purchased Assets in the form attached hereto as Exhibit B.

"Buyer" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day, other than a Saturday, Sunday or legal holiday (as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure).

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 5.1.

"Closing Date" means the first Business Day after the Sale Order becomes a Final Order or such later time as agreed between Seller and Buyer but no later than 15 days after the Sale Order becomes a Final Order.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Contracts" means all contracts, agreements and other arrangements, whether oral or written.

"Debtor's Estate" means the estate created upon the filing by Debtor of a voluntary petition of bankruptcy, in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code, together with all rights, claims and interests pertaining thereto.

"Disputed Ad Valorem Taxes" means those certain claims made by local taxing authorities that are disputed or are disputable by Debtor all listed on Schedule 3.1(p).

"Earnest Money" shall mean $100,000.00 of the Purchase Price, deposited by Buyer into the Escrow Account and not refundable to Buyer unless explicitly provided in Article X.

"Escrow Account" means an escrow account covered by the Escrow Agreement.

"Escrow Agent" means Hoover Slovacek, LLP.

"Estate Transferring Party" means either of Seller and Debtor's Estate.

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Final Order" shall mean shall mean an order or judgment of a Court which has been entered by the Court, and which has not been stayed pending appeal.

"Governmental Entity" means any domestic or foreign governmental or regulation authority, including any department, commission, board, bureau, agency or instrumentality of such authority or any court or tribunal.

"Indebtedness" shall mean (a) any indebtedness for borrowed money or other interest-bearing indebtedness, whether evidenced by any note, bond, debenture or other debt security, (b) any obligations to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business which are not more than ninety (90) days past due, (c) indebtedness of others guaranteed by Seller or secured by an Encumbrance on the Purchased Assets, (d) letters of credit or similar obligations, and (e) any indebtedness created or arising under any conditional sale or other title or retention agreement with respect to acquired property.

"Intellectual Property" means (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, together with the goodwill associated with any of the foregoing, and all applications and registrations for the foregoing, including all renewals of same, (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues, (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists, (iv) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of information), including mask rights, copyrights

therein and thereto, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof, and (v) any other intellectual property or proprietary rights. Specifically, "Intellectual Property" shall include, but not be limited to, the definition of intellectual property as all of the chemical formulas, procedures and methodologies and all related documents, and test results and performance history documents and related materials.

"Law" means any domestic or foreign statute, rule, regulation or other legal requirement.

"Leases" means the interest of Seller, as lessor, lessee or otherwise, in any leases, ground leases, subleases and other instruments and agreements relating to any real or personal property, together with all amendments, modifications and supplements thereto (if any), and all rights and interests of Seller relating thereto.

"Lien" means, as applied to any Person, any lien, charge, claim, pledge, conditional sale agreement or other title retention agreement, lease, mortgage, deed of trust, right of first refusal, security interest, option, proxy, voting trust or agreement, interest, transfer restriction or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Permits and Licenses" has the meaning set forth in Section 2.1(a)(xi).

"Permitted Encumbrances" means (a) any Encumbrance for current property Taxes that are not yet due and payable.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust, union, association, Governmental Entity, tribunal, instrumentality or other entity or authority.

"Pre-Closing Period" has the meaning set forth in Section 8.1(a).

"Purchase Price" has the meaning set forth in Section 4.1.

"Purchased Assets" has the meaning set forth in Section 2.1(a).

"Representatives" shall mean, with respect to any Person, the officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives of such Person.

"Requested Party" has the meaning set forth in Section 8.10(a).

"Requesting Party" has the meaning set forth in Section 8.10(a).

"Sale Order" means the order of the Bankruptcy Court attached as Exhibit A-1, in form and substance reasonably satisfactory to Buyer and Seller, to be issued by the Bankruptcy Court pursuant to sections 363 and 365, and to the extent possible section 1146(c), of the Bankruptcy Code in a form substantially (i) approving this Agreement and the Transaction, (ii) approving the sale of the Purchased Assets to Buyer free and clear of all Liens of any kind whatsoever pursuant to section 363(f) of the Bankruptcy Code and (iii) finding that Buyer is a good faith

purchaser entitled to the protections of section 363(m) of the Bankruptcy Code that is final and not appealable.

"Seller" has the meaning set forth in the preamble to this Agreement.

"Tax" means any tax, levy, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount due, imposed or assessed by any Governmental Entity.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Tax.

"Transaction" means the sale of the Purchased Assets and the other transactions contemplated by this Agreement.

"Transferring Party" means either of Seller and Debtor's Estate.

Section 1.2     Headings, Interpretation, Etc. Headings of the Articles and Sections of this Agreement are for the convenience of the parties only and will be given no substantive or interpretive effect whatsoever. When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule such reference will be to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein," "hereto" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person include such Person's successors and permitted assigns.

ARTICLE II
**PURCHASE AND SALE OF ASSETS**

Section 2.1     Purchase and Sale of Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will sell, assign, transfer, convey and deliver to Buyer, and Buyer will acquire and accept from Seller, all of Seller's right, title and interest in, to and under the properties and assets that are or were used, or held for use, by Seller in the conduct of Seller's business, wherever such properties and assets are situated and of whatever kind or nature, whether tangible or intangible, real, personal or mixed, other than the Excluded Assets (collectively, the "Purchased Assets"), free and clear of all Liens, other than Permitted

Encumbrances, including all of the Transferring Parties' right, title and interest in, to and under the following properties and assets to the extent they are not Excluded Assets:

(i)      the Contracts listed on <u>Schedule 2.1(a)</u>, including deposits and prepaid items thereunder (the "<u>Assumed Contracts</u>"); *provided* that Buyer may elect, in its sole discretion, by giving written notice thereof to Seller prior to Closing, not to acquire or accept any such Contract, whereupon such Contract will be removed from <u>Schedule 2.1(a)</u> and cease to be a Assumed Contract;

(ii)      all tangible personal property, including any equipment, machinery, trucks, cars, other vehicles and rolling stock, furniture, furnishings, fixtures, trade fixtures, tools, appliances, office materials and supplies, computers (laptop and desktop), monitors, servers, network equipment, routers, cables and computer equipment and devices;

(iii)      all trade credits, accounts receivable, proceeds or revenues attributable to the Assets and accruing prior to Closing;

(iv)      all refunds of costs, taxes or expenses attributable to any periods of time prior to Closing, and all refunds, credits, net operating losses and similar tax assets attributable to Income taxes imposed on Seller, and/or its direct and indirect owners;

(v)      all master service agreements between Seller and any Third Party and all rights and privileges thereunder;

(vi)      all cash and cash equivalents (including bank accounts, marketable securities, and short-term investments) in excess of amounts required to pay allowed accrued chapter 11 administrative expenses.

(vii)      all inventory, work in progress, by-products, supplies, parts, shipping materials, packaging materials, raw materials and other consumables;

(viii)      all files, ledgers, manuals, records, reports, books of account, general, financial and Tax records, personnel records, invoices, shipping records, supplier lists, correspondence, memoranda, plats, architectural plans, floor plans, landscape plans, surveys, site plans, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil and substrate tests and studies, engineering tests, studies and reports, purchase orders, operating records, operating manuals, safety manuals, computer and software manuals, technical documentation and other printed, written or electronic materials and documents, records and files and any rights thereto;

(ix)      all credits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items paid by Seller or owed to Seller in connection with its business, including any reserves held by Accounts Lender;

(x)      to the extent transferable, all municipal, state, federal and foreign franchises, permits, licenses, registrations, agreements, waivers, concessions, grants, easements, variances, exemptions, consents, approvals and authorizations, including all deposits and prepaid items in connection therewith (the "Permits and Licenses");

(xi)      all sales and promotional literature, customer lists, marketing plans and studies, other sales materials, phone numbers, email addresses, websites, and similar property;

(xii)     all owned, licensed or otherwise utilized by Seller, including without limitation the rights in and to the name "ESP Petrochemical Solutions, Inc." and similar names thereto;

(xiii)    all guarantees, letters of credit, comfort letters, surety bonds, support agreements and other credit support and any cash or cash equivalents or other security or collateral provided therefor by Seller in support of the obligations of Seller with respect to the Purchased Assets;

(xiv)     all rights, titles, claims and interests of Seller under any insurance policy or agreement, to any insurance proceeds or to or under any bond or bond proceeds, in each such case attributable to acts, events or occurrences prior to Closing;

(xv)      except as otherwise provided herein, all rights and claims, asserted or unasserted, contingent or fixed, known or unknown, relating to the Purchased Assets and attributable to periods of time prior to Closing;

(xvi)     all patents, patent applications, logos, service marks, copyrights, trade names or trademarks of or associated with Seller, or its business

(xvii)    all privileged attorney-client (i) communications and (ii) other documents (other than title opinions);

(xviii)   all audit rights arising under any of the Assumed Contracts with respect to any periods of time prior to Closing;

(xix)     all valuations, bidder lists, presentations and communications with marketing advisors developed or prepared in connection with marketing the Purchased Assets;

(xx)      all insurance policies covering the Purchased Assets, including recoveries and claims thereunder;

(xxi)     to the extent assignable, all warranties, indemnities, guaranties, bonds and similar rights thereto (and all security therefor) from any third party;

(xxii)  to the extent not set forth above, all of Seller's rights in and to all personal property owned by Seller, including assets and equivalents, easements and rights to lake and/or river access, canal use rights, riparian rights of any description, river access road rights or easements, and such other and further property as may be owned by Seller, EXCLUDING such rights or causes of action which may be owned by the Trustee of Debtor's Estate or Seller under the so-called "strong-arm" sections of the United States Bankruptcy Code (11 U.S.C. §544 *et seq.)*;

(xxiii)  all goodwill and other intangible assets including but not limited to Intellectual Property; and

(xxiv)  all post petition causes of actions against or involving current or former employees of the Debtor, including, but not limited to, claims related to trade secrets, breach of confidentiality, and of a similar nature,  but excluding post-petition claims or causes of action against or involving employees or former employees related to (a) the unauthorized transfer of monies or (b) the unauthorized transfer of other tangible property which is unrelated to the Purchased Assets.

(b)  <u>Excluded Assets</u>. Notwithstanding anything in <u>Section 2.1(a)</u> to the contrary, Seller will not sell, convey, assign, transfer or deliver to Buyer, and Buyer will not acquire or accept, and the Purchased Assets will not include, any of Seller's right, title or interests in, to or under the following assets (the "<u>Excluded Assets</u>"):

(i)  any Lease that is not an Assumed Lease;

(ii)  any Contract that is not an Assumed Contract;

(iii)  any assets held in relation to any employee benefit or welfare plan or any contract, policy or arrangement relating to any such plan; and

(iv)  all claims and causes of action arising under Chapter 5 of the Bankruptcy Code and state law made applicable by Section 544 of the Bankruptcy Code, including Seller's right to receive payments, return of property, or other consideration for any judgment or settlement of any such claims or causes of action.

(v)  all cash and cash equivalents (including marketable securities and short-term investments) to the extent that such is needed to pay amounts required to pay allowed accrued chapter 11 administrative expenses.

## ARTICLE III
## NO ASSUMPTION OF LIABILITIES

Section 3.1  <u>Assumption and Exclusion of Liabilities</u>. Other than any liabilities associated with the Purchased Assets arising on or after the Closing Date, Buyer will not assume, cause to be assumed or be deemed to have assumed, or in any way be liable or responsible for,

any liabilities or obligations of the Estate Transferring Parties or predecessors-in-interest, whether or not associated with or arising from any of the Purchased Assets or any other rights, properties or assets of the Estate Transferring Parties or in connection with the ownership, use or possession or the operation or conduct of the business, prior to or on the Closing Date and whether fixed or contingent, known or unknown, now existing or that may arise in the future, including:

(a)     Any liability of Seller for unpaid taxes with respect to the business or the Purchased Assets for periods prior to the Closing Date;

(b)     Any liability of Seller for income, transfer, sales, use, and other taxes arising in connection with the consummation of the transaction contemplated by this Agreement (including any income taxes owed because Seller has deferred gain on any deferred intercompany transaction);

(c)     Any liability of Seller for the unpaid taxes of any person other than any Seller under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract or otherwise;

(d)     Any obligation of Seller to indemnify any person by reason of the fact that such person was a director, officer, manager, employee, agent or a person in any other similar capacity with Seller or was a customer or contracting party with Seller, or was serving at the request of any Seller as a partner, trustee, director, officer, employee, manager, agent or in any other similar capacity with another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses, or otherwise and whether such indemnification is pursuant to any statute, charter document, bylaw, agreement, or otherwise);

(e)     Any liability of Seller for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby;

(f)     Any liability or obligation of Seller under this Agreement;

(g)     Any liability or obligation arising out of or relating to a matter the nondisclosure of which results in a breach of a representation or warranty of Seller contained herein;

(h)     All liabilities and obligations arising out of incidents or events occurring prior to the Closing Date by any person employed by Seller for payment or benefits under workers' compensation laws or any other law;

(i)     All liabilities and obligations arising out of claims made by any person employed by Seller in the business for payment of costs incurred which arise out of incidents or events prior to the Closing Date under any medical insurance plan;

(j)     All liabilities and obligations arising out of claims made by any person employed by Seller in the business which arise out of incidents or events prior to the Closing Date under Fair Labor Standards Act or any other law;

(k)     All liabilities and obligations of the business that arise out of, result from or relate to Seller's ownership or operation of the business for personal injury or property damage that occur or have occurred prior to the Closing Date;

(l)     All Seller warranty obligations unless otherwise explicitly assumed by Buyer;

(m)     All environmental liabilities resulting from or arising out of the ownership or operation of the business, or an environmental claim that a release occurred, in each case prior to the Closing Date;

(n)     Any liabilities and obligations of the business that arise out of, result from or relate to Seller's obligations to past or current employees under the Consolidated Omnibus Budget Reconciliation Act; and

(o)     Any liability or obligation in connection with seller's employee benefit plans (as defined in ERISA sec. 3(3), 29 USC sec. 1002(3)), including pension plans, profit-sharing and 401(k) plans, health insurance plans and all other welfare benefit plans; any non-ERISA benefits and fringe benefits.  Buyer shall not be an adopting or successor employer on any such plans, nor shall Buyer have liability for any premiums, contributions, matches, or other payments of any kind.

Section 3.2 Assumed Liabilities.

(a)     Buyer shall assume pre-petition Ad Valorem Tax liability of approximately $65,000.00 and post petition Ad Valorem Tax liability from the date of petition until the Closing Date.

(b)     The assumption of the Ad Valorem Tax liability as mentioned in Section 3.2(a) is subject to the right to dispute the amount and validity of the Ad Valorem Taxes, as may be allowed by the Texas Property Tax Code. and Louisiana property tax code.

(c)     Buyer shall assume the obligations to the Accounts Lender.

ARTICLE IV
PURCHASE PRICE

Section 4.1     Purchase PriceThe purchase price is calculated as follows:

(i)     Credit bid of $1,750,000.00 which includes a carve out of $125,000.00, including $100,000.00 to cover administrative expenses in the form of the non-refundable earnest money deposit and, upon conversion of the Bankruptcy Case to Chapter 7, payment of $25,000 to the duly appointed Chapter 7 trustee (if the cases are not converted to Chapter 7, this sum of $25,000 will not be paid; plus

(ii)     $122,575.37 for investment banker fees and costs to Chiron Financial; plus

(iii)     Assumption of ad valorem taxes in the approximate amount of $65,000.00; plus

(iv)    Assumption of the Accounts Lender obligations in the amount of approximately $310,000.00; plus

(v)     $300,000.00 in cash allocated to the purchase of the unencumbered rolling stock; plus

(vi)    Assumption of Solstice Capital obligations in the amount of $113,542.83[1]; plus

(vii)   Payment of Ford Motor Finance Obligations in the amount of approximately $9,000.00; plus

(viii)  To the extent not paid prior to conversion of the Bankruptcy Case to Chapter 7, payment of remaining allowed unpaid professional fees of Hoover Slovacek, Debtors' counsel, Charles Johnson, Chief Restructring Officer and Patrick Devine, counsel for Official Committee of Unsecured Creditors in the aggregate amount of $25,000. Buyer reserves the right to object to the allowance of any professional fees asserted in fee applications filed with the Bankruptcy Court.

for a total purchase price of $2,624,000.00, plus up to $25,000 to be paid in accordance with 4.1(viii).


Section 4.2    Earnest Money.

Upon the execution hereof, Buyer shall deposit the Earnest Money with the Escrow Agent subject to the terms of this Agreement.  If Closing occurs, the Earnest Money shall be disbursed to Seller as a portion of the Purchase Price, otherwise the Earnest Money shall be disbursed pursuant to and in accordance with the terms of this Agreement.

Section 4.3    Allocation of the Purchase Price. Within one hundred eighty (180) days after Closing Date, Buyer shall prepare an allocation of the Purchase Price in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended ("*Code*"), and the Treasury regulations thereunder (and any similar provision of state or local Legal Requirements, as appropriate) (the "***Allocation***").  Seller and Buyer hereby agree to be bound by such Allocation, to account for and report the purchase and sale of the Assets contemplated hereby for federal and state Tax purposes in accordance with such Allocation, and not to take any position (whether in Tax Returns (as hereinafter defined), Tax audits, or other Tax proceedings) that is inconsistent with such Allocation without the prior written consent of the other party. Buyer and Seller and their affiliates shall report, act and file all Tax Returns and other information filings, to the extent required, in all respects and for all purposes consistent with such Allocation..

(a)     The transactions contemplated hereby will be reported for Tax purposes in a manner consistent with the Allocation. Neither Buyer nor Seller will take any position inconsistent therewith. Buyer, on the one hand, and Seller, on the other hand, will cooperate with the other in preparing IRS Form 8594 and will furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.

---

[1] Section 4.1(v) is to include the assets that are unencumbered of the Debtor or encumbered by Solstice Capital, LLC.

# ARTICLE V
## THE CLOSING

Section 5.1    <u>Time and Place of Closing</u>. The consummation of the sale and transfer of the Purchased Assets provided for in this Agreement (the "<u>Closing</u>") will occur on the Closing Date, at the offices of HOOVER SLOVACEK, LLP, Galleria Tower II, 5051 Westheimer, Suite 1200, Houston, Texas 77056, subject to satisfaction or waiver of all the conditions to Closing set forth in <u>Article IX</u>.

Section 5.2    <u>Deliveries by Seller</u>. At the Closing, Seller will deliver to Buyer the following:

(a)    A certified copy of the Sale Order;

(b)    each Ancillary Agreement required to be duly executed by Seller;

(c)    if applicable, a foreign person affidavit sworn to by Seller as required by Section 1445 of the Code;

(d)    releases and other documentation reasonably requested by Buyer in form and substance reasonably satisfactory to Buyer providing for the termination and release of all Liens on the Purchased Assets, except for *ad valorem tax liens and the lien of the Accounts Lender*; *provided*, *however*, should any party which holds a Lien(s) in any of the Purchased Assets refuse to execute and deliver such releases and other documentation providing for the termination and release of such Lien(s), Seller shall obtain Bankruptcy Court authority to execute such documents on behalf of any refusing party pursuant to Fed. R. Civ. P. 70 and Fed. R. Bkr. P. 7070, as a separate order of the Bankruptcy Court or to be included in the Sale Order;

(e)    such other documents and instruments as may be reasonably required to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to comply with the terms hereof and thereof; and

(f)    to the extent in Seller's possession or control, all keys, security cards, combinations to safes, and alarm codes necessary to operate all locks, barriers, safes, scanners, and other security devices, and all passwords and security questions used in connection with any of the foregoing in the Business;

Section 5.3    <u>Deliveries by Buyer</u>. At the Closing, Buyer will deliver to Seller and Escrow Agent, as applicable, the following:

(a)    the Adjusted Purchase Price;

(b)    each Ancillary Agreement required to be duly executed by Buyer; and

(c)    such other documents and instruments as may be reasonably required to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to comply with the terms hereof and thereof.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

Section 6.1 <u>Authorization, No Conflicts, Etc.</u> Seller, subject to the entry and effectiveness of the Sale Order, has the requisite power and authority to execute and deliver this Agreement and to execute and deliver the Ancillary Agreements and all other agreements, instruments and documents contemplated hereby to be executed and delivered by it. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and (assuming this Agreement constitutes a valid and binding obligation of Buyer and upon the entry and effectiveness of the Sale Order) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms. Subject to the entry and effectiveness of the Sale Order, neither the execution and delivery of this Agreement, the Ancillary Agreements, or any other agreement, instrument or document contemplated hereby to be executed and delivered by Seller nor the performance of the obligations of Seller hereunder or thereunder will result in the (i) violation of any applicable Law, (ii) require any filing with or permit, consent or approval of, or the giving of any notice to, any Person (including filings, consents or approvals required under any Permits and Licenses to which Seller is a party), (iii) result in a violation or breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Seller or to a loss of any benefit to which Seller is entitled under, any Assumed Contract or Assumed Lease binding upon Seller or any of the Permits and Licenses, franchises or other similar authorizations held by Seller, or (iv) result in the creation or imposition of any Lien (other than Permitted Encumbrances) on any asset of Seller.

Section 6.2 <u>Consents and Approvals</u>. No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be made or obtained by Seller in connection with the execution and delivery of this Agreement, the Ancillary Agreements, or any other agreement, instrument or document contemplated hereby to be executed and delivered by Seller or the performance of the obligations of Seller hereunder or thereunder, except for (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court in connection with the entry and effectiveness of the Sale Order, (ii) the filing of such assignments or other conveyance documents as may be required to transfer Seller's interest in any Purchased Assets, and (iii) the filing of such documents as may be necessary to reflect the release of any Liens as a matter of public record.

Section 6.3 <u>Title to Assets; Liens</u>. Seller has good, valid, legal and indefeasible title to the Purchased Assets. Subject to entry and effectiveness of the Sale Order, at the Closing, Seller will transfer to Buyer good, valid, legal and indefeasible title to all of the Purchased Assets, free and clear of all Liens and Claims, other than Permitted Encumbrances. To the best of Seller's knowledge, information and belief, after diligent inquiry, Purchased Assets constitute property of Debtor's Estate pursuant to Section 541 of the Bankruptcy Code. At the Closing, in accordance with the terms of the Sale Order, Seller shall execute any documents required to transfer to Buyer good, valid, legal and indefeasible title to the Purchased Assets, free and clear of all Liens and Claims, other than Permitted Encumbrances pursuant to Section 363(f) of the Bankruptcy Code.

Section 6.4     Material Facts. Seller has disclosed to Buyer all material facts known to it relating to Seller, the business of Seller, and the Purchased Assets, including but not limited to those contained within the docket entries supplied by Seller to Buyer prior to the date of this Agreement.

Section 6.5     FIRPTA Certification. Seller is not a "foreign person" as defined in Section 1445 of the Code.

ARTICLE VII
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as follows:

Section 7.1     Due Organization, Etc. Buyer is a corporation duly organized, validly existing and in good standing under the Laws, if any, that govern its continued corporate existence. Buyer has the requisite power and authority to execute and deliver this Agreement and to execute and deliver the Ancillary Agreements and all other agreements, instruments and documents contemplated hereby to be executed and delivered by it.

Section 7.2     Authorization, Etc. Buyer has the requisite power and authority to execute and deliver this Agreement and to execute and deliver the Ancillary Agreements and all other agreements, instruments and documents contemplated hereby to be executed and delivered by it. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by Buyer and (assuming this Agreement constitutes a valid and binding obligation of Seller and upon the entry and effectiveness of the Sale Order) constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms.

Section 7.3     Consents and Approvals. No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be made or obtained by Buyer in connection with the execution and delivery of this Agreement, the Ancillary Agreements, or any other agreement, instrument or document contemplated hereby to be executed and delivered by Buyer or the performance of the obligations of Buyer hereunder or thereunder, except for (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court in connection with the entry and effectiveness of the Sale Order, (ii) consents, approvals or authorizations necessary to transfer the Permits and Licenses, and (iii) consents, approvals or authorizations, declarations or filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

# ARTICLE VIII
# COVENANTS

Section 8.1    Conduct of Business. During the period from the date of this Agreement through the earlier of the Closing or the termination of this Agreement in accordance with Article X (the "Pre-Closing Period"), except as otherwise provided in this Agreement, Seller will, to the extent commercially reasonable, conduct its operations in the ordinary and usual course of business consistent with past practice. Without limiting the preceding sentence, Seller shall not enter into any Contract between the date of this Agreement and the Closing that includes any limitation or restriction on Seller's right to assign all of its rights, duties, powers and obligations under said Contract to any Person.

(a)    Without limiting the generality or effect of the foregoing, during the Pre-Closing Period, Seller will use its commercially reasonable efforts to (i) preserve intact its business organization, (ii) keep available the services of leased employees, (iii) continue in full force and effect without material modification all existing material policies or binders of insurance currently maintained in respect to the Estate Transferring Parties, (iv) pay Seller's post-petition debts (other than debts owed to professionals employed by Seller but only if approved by the Bankruptcy Court) and trade and other accounts payable punctually when and as the same will become due and payable and perform and observe, in all material respects, its duties and obligations under all Assumed Contracts, (v) maintain the Purchased Assets in the same condition as they are as of the date hereof, subject only to ordinary wear and tear and other changes in the ordinary and usual course of business consistent with past practice, and (vi) maintain its relationships and goodwill with customers, mechanics, materialmen, suppliers, landlords, employees, agents and others having business relationships with Seller.

(b)    Except as expressly permitted herein, Seller will not, without the prior written consent of Buyer (i) renew, amend or voluntarily terminate any Assumed Lease or Assumed Contract, (ii) encumber, sublease or otherwise grant any Liens or other rights with respect to the Purchased Assets, or (iii) enter into any Contracts affecting the Purchased Assets or that will be binding on Buyer.

Section 8.2    Access. During the Pre-Closing Period, Seller will (i) allow all designated officers, attorneys, accountants and other representatives of Buyer reasonable access at reasonable times to the leased employees, accountants and other representatives of Seller and the books and records of Seller and (ii) furnish to Buyer and its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information as such Persons may reasonably request.

Section 8.3    Bankruptcy Filings. Seller has filed with the Bankruptcy Court a motion seeking entry of the Sale Order. Seller will use its commercially reasonable efforts to cause the Sale Order to become a Final Order on or before April 14, 2017. Seller will perform and comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the rules promulgated thereunder in connection with obtaining entry of the Sale Order. Buyer will promptly take all actions reasonably requested by Seller to assist in

obtaining the entry of the Sale Order. Seller will perform and comply with all of the obligations of Seller the Sale Order (after entry thereof).

Section 8.4    Commercially Reasonable Efforts. Buyer, on the one hand, and Seller, on the other hand, will use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with each other in doing, all things necessary, proper or advisable to consummate, in the most expeditious manner practicable, the transactions contemplated hereby, including the satisfaction of the conditions set forth in Article IX.

Section 8.5    Filings with Governmental Entities; Permits and Licenses. Without limiting the generality or the effect of Section 8.4, Buyer, on the one hand, and Seller, on the other hand, will (i) cooperate with each other in connection with, and use their respective commercially reasonable efforts to provide information required for, any application or other filing to be made with any Governmental Entity in connection with the transactions contemplated by this Agreement, and (ii) cooperate with each other in connection with, and use their respective commercially reasonable efforts to resolve, objections, if any, that are asserted by any Governmental Entity with respect to the transactions contemplated hereby.

(a)    Without limiting the generality or effect of Section 8.4, Buyer, on the one hand, and Seller, on the other hand, will use their commercially reasonable efforts to (i) effect the transfer of the Permits and Licenses to Buyer on the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) enable Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations and authorizations as may be necessary for the lawful operation of the Purchased Assets by Buyer from and after the Closing Date.

Section 8.6    Tax Matters. Buyer, on the one hand, and Seller, on the other hand, will (i) provide each other with any assistance that may reasonably be requested by the other in connection with the preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other with any records or other information that may be relevant to that Tax Return, audit, examination or proceeding, and (iii) provide each other with any final determination of any such audit, examination or proceeding that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, Buyer, on the one hand, and Seller, on the other hand, will retain until the applicable statutes of limitations (including any extensions) have expired copies of all records or information that may be relevant to Tax Returns filed by the other for all Tax periods or portions thereof ending before or including the Closing Date. After the expiration of all applicable statues of limitations, such records and information may be destroyed by either party if such party sends to the other party written notice of its intent to destroy such records and information, specifying with particularity the contents of the records and information to be destroyed. Such records and information may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice will deliver, at the objecting party's expense, such records to the objecting party.

Section 8.7    <u>Amounts Received and Paid to Seller After Closing</u>. Following the Closing, Seller will promptly pay, or cause to be paid, by wire transfer of immediately available funds to Buyer any amounts that are received by Seller, in respect of any of the Purchased Assets, and provide Buyer with information as to the nature and source of any such amount.

Section 8.8    <u>Further Assurances</u>. Seller will execute and deliver such agreements, instruments and documents and take such other action as may be reasonably requested by Buyer in order to carry out this Agreement and consummate and make effective the transactions contemplated hereby.

(a)    Without limiting the generality or effect of <u>Section 8.8(a)</u>, Seller will execute, deliver and cause to be filed such assignments and other conveyance documents as may be required to transfer Seller's interest in any Purchased Assets, the title to which is governed by filing in the public records (by way of example,  water craft, trucks, cars, other vehicles and rolling stock).

Section 8.9    <u>Books and Records</u>. Buyer and Seller will preserve for a period of three years after the Closing Date (or such longer period as may be required by any Governmental Entity or ongoing claim) all books and records pertaining to the business and operations of Seller prior to the Closing Date. After the Closing Date, where there is a legitimate purpose, the party hereto that has received a request for access (the "<u>Requested Party</u>") will provide the party hereto requesting access (the "<u>Requesting Party</u>") with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to the books of account and records of the Requested Party, but, in each case, only to the extent relating to the acts, conduct, property, liabilities, financial condition and conduct of the business of Seller prior to the Closing Date, and the Requesting Party and its authorized representatives will have the right to make copies of such books and records; *provided*, *however*, that the foregoing right of access will not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of the Requested Party. After the expiration of the three-year period following the Closing Date (or such longer period as had been required by any Governmental Entity or ongoing claim), such books and records may be destroyed by either party if such party sends to the other party written notice of its intent to destroy such books and records, specifying with particularity the contents of the books and records to be destroyed. Such books and records may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice will deliver, at the objecting party's expense, such records to the objecting party.

(a)    Seller agrees that it will not use, publish, disseminate, distribute or otherwise disclose all or any portion of the books and records obtained from Buyer without the prior written approval of Buyer. In the event that Seller receives either a request to disclose all or any portion of such books or records under the terms of a subpoena or order issued by a court or other governmental or regulatory authority or advice of legal counsel that disclosure is required under applicable law, Seller agrees that, prior to disclosing any such portion of such books or records, it will (i) immediately notify Buyer of the existence and terms of, and the circumstances attendant to, such request or advice, (ii) consult with Buyer as to the advisability of taking, at Buyer's sole expense, legally available steps to resist or narrow any such request or to otherwise

eliminate the need for such disclosure, and (iii) if disclosure is required, cooperate with Buyer to obtain, at Buyers' sole expense, a protective order or other reliable assurance that confidential treatment will be accorded to such portion of such books and records as is required to be disclosed.

Section 8.10   Notice of Sale. Notice of this Agreement and notice of the motion to approve this sale and related Sale Order and the hearings therefor shall be duly and properly given by (i) actual notice to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on the Purchased Assets,  the non-Seller parties to the Assumed Contracts, and applicable taxing and Governmental Entities.

ARTICLE IX
**CONDITIONS**

Section 9.1   Conditions to Seller's Obligations. Seller's obligations to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or written waiver by Seller) at or prior to the Closing Date of each of the following conditions:

(a)   Representations and Warranties; Covenants.

(i)   All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that speak as of an earlier date, which shall be true and correct as of such date), except that those representations and warranties made by Buyer that contain materiality or other similar qualifiers shall be true and correct in all respects.

(ii)   Buyer shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date in all material respects.

(b)   No Injunction. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

(c)   Sale Order. The Bankruptcy Court shall have entered the Sale Order on or before April 14, 2017.

(d)   Buyer's Deliveries. Buyer shall have duly executed and delivered to Seller each agreement, instrument and document required to be delivered under Section 5.3.

Section 9.2   Conditions to Buyer's Obligations. Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or written waiver by Buyer) at or prior to the Closing Date of each of the following conditions:

(a)   Representations and Warranties; Covenants.

(i) All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that speak as of an earlier date, which shall be true and correct as of such date), except that those representations and warranties made by Seller that contain materiality or other similar qualifiers shall be true and correct in all respects.

(ii) Seller shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date in all material respects.

(b) <u>No Injunction</u>. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

(c) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order on or before April 14, 2017.

(d) <u>Seller's Deliveries</u>. Seller shall have duly executed and delivered to Buyer each agreement, instrument and document required to be delivered under <u>Section 5.2</u> and <u>Section 8.8</u>.

(e) <u>Material Adverse Effect</u>. There shall have been no change, event or development since the date of this Agreement that has had or would reasonably be expected to have a material adverse effect on the condition or value of the Purchased Assets or the operations relative to the Purchased Assets.

(f) <u>Permits and Licenses</u>. Buyer shall have verified that all permits, licenses, approvals, consents, certificates, registrations and authorizations as may be necessary for the lawful operation of the Purchased Assets by Buyer from and after the Closing Date are current and in full force and effect.

(g) <u>Cooperation of Debtors</u>. Seller shall have provided complete access to Buyer to all financial and operating statements, together with the supporting documents, all Assumed Contracts, and all other agreements of all kinds and all such other items and materials as Buyer may from time to time reasonably request which are in the possession or under the control of either Debtor.

## ARTICLE X
## TERMINATION

Section 10.1 <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by the mutual consent of Buyer and Seller;

(b) by Buyer (provided that Buyer is not then in material breach of any provision of this Agreement):

(i)        if all of the conditions in <u>Section 9.1</u> have been satisfied but Seller fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii)       if the Closing does not occur on or before the Closing Date, unless the failure to consummate the Closing is due to the failure of Buyer to perform any of its obligations under this Agreement to the extent required to be performed by Buyer on or prior to the Closing Date;

(iii)      if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of Buyer set forth in <u>Section 9.2</u>;

(iv)      if Seller has not used its commercially reasonable efforts to cause the Sale Order to become a Final Order by April 14, 2014; *provided*, *however*, that taking any action required or permitted by <u>Section 8.3</u> shall not be deemed to be a failure by Seller to exert its commercially reasonable efforts; or

(v)       if Seller executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction.

(c)        by Seller (provided that Seller is not then in material breach of any provision of this Agreement):

(i)        if all of the conditions in <u>Section 9.2</u> have been satisfied, but Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii)       if the Closing does not occur on or before the Closing Date, unless the failure to consummate the Closing is due to the failure of Seller to perform any of its obligations under this Agreement to the extent required to be performed by Seller on or prior to the Closing Date; or

(iii)      if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of Seller set forth in <u>Section 9.1</u> and cannot be cured within ten (10) Business Days after the giving of notice to Buyer.

(d)        By Buyer or Seller:(i) if the Bankruptcy Court has not entered the Sale Order by April 14, 2017, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court and such stay is not terminated, or (B) ceases to be effective and is not reinstated on or before such date;

(ii)       upon the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case, or any

similar commencement of liquidation proceedings relating to Seller prior to Closing; or

(iii)    if Seller executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction; *provided, however*, if Buyer is determined by the Bankruptcy Court to have submitted the Back-Up Bid, neither Buyer nor Seller may terminate this Agreement until such time as Seller closes an Alternative Transaction with the third party determined by the Bankruptcy Court to have submitted the Highest and Best Bid.

Section 10.2    Procedure and Effect of Termination. In the event of termination of the transactions contemplated hereby pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party to this Agreement, and this Agreement shall terminate (subject to the following provisions of this Section 10.2 and Section 10.3 below) and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto.  If this Agreement is terminated as provided herein:

(a)    upon request therefore, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

(b)    If this Agreement terminates on account of any condition other than as provided in Article 10.1, then within five (5) days following such termination, Seller and Buyer shall instruct the Escrow Agent to disburse the Earnest Money to Seller. In such event, the delivery of the Earnest Money to Seller shall constitute liquidated damages for any loss suffered by Seller, and Buyer shall have no further liability to the Seller of any kind or character.

(c)    If this Agreement is terminated for any reason provided in Article 10.1 herein other than subsections (d)(ii), then within five (5) days following such termination, Seller and Buyer shall instruct the Escrow Agent to disburse the Earnest Money to Buyer. In such event, the return of the Earnest Money to Buyer shall constitute liquidated damages for any loss suffered by Buyer, and Seller shall have no further liability to the Buyer of any kind or character.  For the avoidance of doubt, the purpose of the exclusions noted in this subsection is to effectuate the carve out referred to in Section 4.1 hereof.

(d)    THE PARTIES ACKNOWLEDGE AND AGREE THAT (i) EACH PARTY'S ACTUAL DAMAGES RESULTING FROM ANY SUCH TERMINATION UNDER THIS ARTICLE X WOULD BE DIFFICULT, IF NOT IMPOSSIBLE TO CALCULATE, (ii) THE EARNEST MONEY IS A FAIR AND REASONABLE ESTIMATE OF THE TERMINATING PARTY'S LIQUIDATED DAMAGES  IN LIGHT OF THE UNCERTAINTIES IN CALCULATING THE ACTUAL DAMAGES THAT WOULD BE SUFFERED BY SUCH PARTY UNDER THE CIRCUMSTANCES SET FORTH IN THIS **Article X,** AND (iii) SUCH LIQUIDATED DAMAGES ARE NOT A PENALTY. Notwithstanding anything to the contrary in this Agreement, in no event shall either Party be entitled to receive any indirect,

consequential, punitive or exemplary damages, or damages for lost profits of any kind or loss of business opportunity.

ARTICLE XI
**MISCELLANEOUS**

Section 11.1   <u>Successors and Assigns</u>. The provisions of this Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns. Buyer may, before the Closing, sell, assign, transfer, convey or delegate any of its rights or obligations under this Agreement to a nominee or assignee at Buyer's sole discretion. Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the parties to this Agreement or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 11.2   <u>Notices</u>. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally against written receipt, by electronic or facsimile transmission with confirmation, mailed (postage prepaid by certified or registered mail, return receipt requested) or by overnight courier to the parties at the following addresses (or at such other address, electronic mail or facsimile number for a party as will be specified by such party by like notice):

If to Seller, addressed to:

ESP Petrochemicals, Inc.
PO Box 640
Rayne, LA 70520
Email: david.dugas@espchem.com

With copies (which will not
constitute notice hereunder) to:

Hoover Slovacek, LLP
c/o Edward L. Rothberg
5051 Westheimer
Suite 1200
Houston, Texas 77056
Phone: (713) 977-8686
Facsimile: (713) 977-5395
Email: Rothberg@hooverslovacek.com

If to Buyer, addressed to:
Encore Chemical Solutions, LLC
c/o Harold N. May
Two Riverway, 15th Floor
Houston, Texas 77056
Facsimile: (832) 201-7675

With copies (which will not
constitute notice hereunder) to:

Harold "Hap" May, PC
c/o Harold N. May
Two Riverway, 15th Floor
Houston, Texas 77056
Facsimile: (832) 201-7675
Email: hap.may@may-firm.com

Bridge Capital Corporation, Inc.
c/o Erich Mundinger
2365 Rice Blvd., Suite 201
Houston, Texas 77005
Email: emundinger@bridgecapitalcorp.com

If to Secured Lender, addressed to:
[Solstice Equipment, LLC]
c/o Erich Mundinger2365 Rice Blvd., Suite 201

Email: emundinger@bridgecapitalcorp.com

With copies (which will not
constitute notice hereunder) to:

Edward L. Rothberg
Hoover Slovacek LLP
Galleria Tower II
5051 Westheimer
Houston, TX 77056

Facsimile: (713) 977-5395
Email: rothberg@hooverslovacek.com

All such notices, requests and other communications given pursuant to this Section 11.2 will be
deemed to have been given (i) if delivered personally on the date of delivery or on the date
delivery was refused by the addressee, (ii) if delivered by electronic or facsimile transmission,
when transmitted to the applicable electronic mail or facsimile number so specified in (or
pursuant to) this Section 11.2 and an appropriate confirmation is received, (iii) if delivered by
mail in the manner described above to the address as provided in this Section 11.2, be deemed
given three Business Days after mailing, or (iv) if delivered by overnight courier, on the date of
delivery as established by the return receipt or courier service confirmation (or the date on which
the courier service confirms that acceptance of delivery was refused by the addressee).

Section 11.3   Expenses; Transfer Taxes. Except as otherwise provided in this
Agreement, all costs and expenses incurred in connection with this Agreement will be paid by

the party incurring the cost or expense. All transfer, documentary, sales, use, stamp, registration and other similar transaction type Taxes, and all duties, conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement will be paid by the party responsible therefor under applicable Law.

Section 11.4   Entire Agreement. This Agreement and the exhibits and schedules hereto, and any agreement, instrument or document delivered by the parties in connection herewith or therewith, constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings (both written and oral) between the parties with respect thereto.

Section 11.5   "AS IS/WHERE IS" SALE. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE VI, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND (INCLUDING ANY REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY OR FITNESS OF THE PURCHASED ASSETS FOR THEIR INTENDED PURPOSES OR ANY PARTICULAR PURPOSE), EXPRESSED OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES. BUYER ACKNOWLEDGES THAT THE PURCHASED ASSETS ARE BEING SOLD, TRANSFERRED, CONVEYED, ASSIGNED AND DELIVERED TO, AND ACQUIRED AND PURCHASED BY, BUYER ON AN "AS IS/WHERE IS" BASIS.

Section 11.6   Waiver. Except as provided in this Agreement, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. The waiver by any party of a breach of any provision hereunder will not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder. At any time prior to the Closing, any party hereto may as to itself (i) extend the time for the performance of any of the obligations or other acts of any of the other parties, (ii) waive any inaccuracies in the representations and warranties of any of the other parties contained herein or in any agreement, instrument or document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions contained herein. Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the party to be bound thereby.

Section 11.7   Amendment. Subject to applicable Law, including the requirements of the Bankruptcy Code and orders of the Bankruptcy Court, this Agreement may only be amended by an instrument in writing signed by Seller and Buyer.

Section 11.8   Counterparts; Facsimile Signatures. This Agreement may be executed by the parties hereto in any number of counterparts, each of which when so executed and delivered will be an original, with the same effect as if the signature thereto were upon the same instrument. Each counterpart may consist of a number of copies hereof each signed by one, but together signed by all of the parties. An electronic copy of a signature page will be deemed to be an original signature page.

Section 11.9   <u>Choice of Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of Texas, without regard to its conflict of laws principles.

Section 11.10   <u>Jurisdiction; Consent to Service of Process</u>. Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court from such court, in any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in the Bankruptcy Court.

(a)   It is a condition precedent to the right of each party hereto to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in the Bankruptcy Court, and if each such court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(b)   No party hereto may move to (i) transfer any such suit, action or proceeding from the Bankruptcy Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in the Bankruptcy Court with a suit, action or proceeding in another jurisdiction, or (iii) dismiss any such suit, action or proceeding brought in the Bankruptcy Court for the purpose of bringing the same in another jurisdiction.

(c)   Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in the Bankruptcy Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such party. Each party hereto irrevocably consents to service of process in any manner permitted by Law.

Section 11.11   <u>Damage or Destruction</u>. In the event of any loss or damage to all or any portion of the Purchased Assets caused by fire or any other casualty between the date hereof and the Closing, Buyer shall have the right to terminate this Agreement by giving written notice to Seller within ten (10) days following the provision of written notice to Buyer of such casualty, in which event this Agreement shall be terminated, and neither party shall have any further obligations hereunder other than those which expressly survive.  If Buyer does not elect to terminate this Agreement, the net proceeds of any insurance collected by Seller prior to the Closing and the amount of any deductible under the insurance policy(ies) maintained by Seller with respect to the Purchased Assets as of the date hereof will be paid to Buyer at the Closing, all unpaid claims and rights of Seller under such insurance that have not been collected by the time of the Closing shall be assigned to Buyer at the Closing, and the Purchase Price shall not be reduced or adjusted as a result thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**BUYER:**
**Encore Petrochemicals, LLC**

_____

Name:  Erich Mundinger

Title:   Authorized  Agent  with  authority  to bind

**SELLER:**
**ESP Petrochemicals, Inc.**

_____

Name:

Title:

**[Signature Page of Asset Purchas Agreement by and between ESP Petrochemicals, Inc. and Encore Chemical Solutions, LLC]**

**Schedule 2.1(a)**

**Assumed Contracts**

**CONTRACT NAME:**

**Solstice Capital Leases – cure waived**

**EXHIBIT A-1**


**PROPOSED SALE ORDER**

**Exhibit B**

**Form of Bill of Sale**

**(TO BE SUPPLEMENTED)**

**Exhibit C**

**Form of Assignment and Assumption Agreement**

**(TO BE SUPPLEMENTED**

**Exhibit D**

**Form of Escrow Agreement**

**(TO BE SUPPLEMENTED)**